**STATE of Missouri, Respondent,**

v.

**John WEISS, Appellant.**

**No. WD 57015.**

Missouri Court of Appeals, Western District.

May 2, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 27, 2000.

Application for Transfer Denied Aug. 29, 2000.

Emmett D. Queener, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Stacy L. Anderson, Asst. Atty. Gen., Jefferson City, for respondent.

Before Presiding Judge LAURA DENVIR STITH, Judge ROBERT G. ULRICH and Judge JAMES M. SMART, Jr.

LAURA DENVIR STITH, Presiding Judge.

John M. Weiss appeals a jury verdict finding him guilty of stealing in violation of Section 570.030 RSMo 1994, for which he was sentenced to 6 months in the county jail and ordered to pay a $2,500.00 fine. He asserts that the prosecutor committed plain error constituting manifest injustice when he intentionally and deliberately misrepresented to the jury that Defendant had no documents to support his claim that he thought the money he was accused of stealing was money he had received in a "buy-out" from his old employer. In fact, the record is clear that Defendant tried to present such documents but had been prevented from doing so by the prosecutor's hearsay objection. Because we find that the record does show that the prosecutor intentionally and deliberately misrepresented this factual issue to the jury and argued it as a basis for disbelieving Defendant's version of the facts, we concur that plain error affecting manifest injustice occurred, requiring reversal and remand for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Viewed in the light most favorable to the verdict, the facts adduced below are as follows: During 1997, a man named John M. Weiss, the victim, having the same middle initial as Defendant, had a checking account with Nations Bank on which both he and his mother had signatory authority. On April 4, 1997, Defendant John M. Weiss opened a savings account at the Belton, Missouri branch of Nations Bank. He also applied for an ATM card for his savings account. By coincidence, this other John M. Weiss happened to apply the same day for an ATM card for his Nations Bank checking account. Nations Bank erroneously treated both ATM card requests as if they came from Defendant Weiss, and sent him an ATM card which allowed him to access the other John M. Weiss' checking account as the primary account and to his own savings account as the secondary account.

Defendant Weiss first used the ATM card on May 2, 1997, when he attempted to deposit a $526.85 check into his savings account and then receive back $400.00 in cash. Three days later, Defendant used his ATM card to check his account and confirm that the net deposit of $126.85 had been posted to his savings account. When he could not find the deposit, Defendant contacted the Belton branch manager at Nations Bank, who informed him that the

funds had not been deposited into his savings account, but instead into "his" (in reality, the victim John M. Weiss') checking account. Defendant then requested that this money, as well as an additional $300.00, be transferred from the checking account, which in fact belonged to the victim, into his savings account. Still believing that both accounts belonged to Defendant Weiss, the bank complied.

In the month that followed, Defendant made a number of transactions accessing the victim's checking account. Between May 5 and June 2, 1997, the Defendant accessed the victim's checking account a total of 147 times, making withdrawals or transfers to his savings account on 54 occasions. The other 93 times he accessed the victim's checking account Defendant either made a balance inquiry or was denied a request for withdrawal because the account had reached the bank's daily ATM withdrawal limit of $800.00.

On June 6, 1997, after learning of the unauthorized access to his account, the victim filed a police report. Two days later, Sargent Victor Kurtz questioned Defendant. Counsel was present at this interview. Defendant stated that he had two accounts with Nations Bank, a checking account opened in 1990 and the savings account opened in 1997, and that the source of the money he was withdrawing came from an IRA he had opened after rolling-over funds from his federal Thrift Savings Plan. He claimed he was withdrawing the money in contemplation of bankruptcy.

Defendant was again interviewed by police on July 21, 1997, after further investigation by police revealed that the checking account Defendant opened in 1990 was closed in 1991. At that time, he claimed that the 1990 checking account was still open, but he could produce no statements or records of activity from that account subsequent to 1991. Additionally, Defendant claimed that he had saved the money from his IRA, although evidence at trial showed these funds had been exhausted by the latter part of 1994.

Defendant was arrested and charged with stealing in violation of Section 570.030 RSMo 1994. At trial, Defendant for the first time attempted to introduce evidence that he had received "buy-out" money when he retired, in addition to the funds from his IRA which he had initially mentioned to police. He testified that he had deposited this money into his checking account in 1994, and that he had believed that this was the money he was accessing in 1997. He then attempted to introduce documentation that he had received "buy-out" money in 1994. The State objected to introduction of this evidence, as follows:

PROSECUTOR: Your Honor, may we approach?

THE COURT: Yes.

(The following proceedings were had at the Bench:)

PROSECUTOR: Your Honor, I don't know exactly when to do this. I see [defense counsel] reaching for documents that he provided to me on Monday after the Law Day, late into the evening. I object to these documents on several grounds, and I cannot adequately protect myself, after he waves them around in front of the jury, by objecting then.

I object first, because they were disclosed in an untimely manner. More importantly, I object because with the witnesses they've disclosed it's not possible to lay anything – lay a foundation to support their admission. If he gets up and waves these papers around, *the jury will infer they do in fact exist in evidence, and I am trying to hide them.*

They don't show what they are purporting to show, and there's no appropriate foundation witnesses to put them in. So I ask to come up here, lodge that objection at this time, and defer to the Court's judgment how to handle it.

DEFENSE: First, Judge, the documents were provided immediately upon the problem arising. Secondly, I believe that the witness can confirm that these were documents he received at the time he was discharged from the federal agency – various federal agencies.

*I would also point out that without this information he has no way to demonstrate that he did in fact have money that he could deposit into these accounts.*

THE COURT: Let me see them.

PROSECUTOR: That's exactly the point.

THE COURT: Let me see them.

DEFENSE: (Indicating.) There are three, your Honor. Here, this is a payroll stub somewhat –

PROSECUTOR: Your Honor, please –

THE COURT: Jim can hear you. You need to whisper in the microphone.

DEFENSE: This was a payroll stub somewhat earlier than the discharge. We have done some calculations that – to show that in fact he received another $1,200 at the time of his discharge.

THE COURT: Okay. He can testify about what he received, but that does not make these documents admissible. They are still hearsay.

(emphasis added).

The Prosecutor then cross-examined Defendant as follows:

PROSECUTOR: Do you know if these checks that you got, the $5,000 you mentioned and [the] $2,000 one from the Civil Service Retirement Fund, do you know if those are required to be written out of Denver through the Department of Defense account?

DEFENDANT: They didn't come from Denver.

PROSECUTOR: No, I didn't mean they come from Denver, but the checks themselves might have been written in Denver at the headquarters, shipped to you and given to you here?

DEFENDANT: I couldn't tell. All I know, they come by mail.

PROSECUTOR: Did you check to see if there's any record of these checks up in Denver?

DEFENDANT: No, sir, I did not.

PROSECUTOR: Would it surprise you that I checked and couldn't find any?

DEFENDANT: I couldn't tell you. I could call civilian personnel in Milwaukee, and they could trace it.

PROSECUTOR: But you didn't do that before today?

DEFENDANT: No, sir.

PROSECUTOR: Do you think it might be important?

DEFENDANT: **Well, I had copies of it right here. That buy-out is right here –**

PROSECUTOR: *I'm not asking you any questions, Mr. Weiss. Please wait.*

And, in his closing argument, the Prosecutor stated:

In fact, the record here – And you can look at this when you go back, you can look at all these records when you go back to deliberate. This record shows exactly what happened to that $9,000. It shows that he paid a 30 percent penalty the same day he opened the account. He took the money out, and over the course of a month, through some 60 checks, he just spent it. This proves that.

In fact, the defendant doesn't deny that now. Well, if it wasn't that money, it must have been some other money. Now, it's time for the second story. This one's a new one. *This week the defendant says it wasn't that retirement money, I've changed my mind, it was some other money. But he has no record of it.*

He isn't sure of the amount, there's no deposit slip, there are no bank statements, not a single witness. *The bank has no record, the Department of De-*

*fense has no record. The defense has actually shown you not one single record, no payroll record, nothing, to show that this other money even ever existed. Maybe it didn't.*

(emphasis added).

The jury found Defendant guilty of stealing and recommended a six month sentence and payment of a fine determined by the court. On February 22, 1999, Defendant was sentenced to six months imprisonment in the county jail and fined $2,500.00. This appeal followed.

## II.  STANDARD OF REVIEW

■■■ Defense counsel failed to object to the prosecutor's closing argument comments to which he now objects, either at trial or in his motion for a new trial. The alleged errors therefore have not been preserved for review. Rule 29.11(d). In our discretion, however, we may review Defendant's claims for plain error. Rule 29.12(b). "Plain error relief is only appropriate when the alleged error so affects the rights of the defendant as to cause a manifest injustice or miscarriage of justice." *State v. Phelps*, 965 S.W.2d 357, 358 (Mo.App. W.D.1998).

## III.  LEGAL ANALYSIS

Defendant raises three points on appeal. Because his first point is dispositive, we need not reach the other two as they may not occur on retrial. In his first point, Mr. Weiss claims that plain error occurred when the trial court allowed the State to tell the jury during closing argument that Defendant failed to present any evidence that another source of funds existed when the State knew such evidence did exist and that it had not been introduced only because the State had successfully argued that it should be excluded. This constituted, he argues, an affirmative misrepresentation and affirmative misconduct by the prosecutor, and these improprieties merit reversal and remand for a new trial. We agree that the prosecutor's misconduct re-

quires us to reverse and remand for a new trial.

■■■ It is well-settled in Missouri that it is error for a prosecutor to "comment on or refer to evidence or testimony that the court has excluded." *State v. Hammonds*, 651 S.W.2d 537, 539 (Mo.App. E.D.1983). *See also State v. Harris*, 870 S.W.2d 798, 810 (Mo. banc 1994). Whether that error requires reversal depends on the circumstances of the particular case, and particularly on the strength of the other evidence and whether the prosecutor intentionally misrepresented the facts in making the comment. *Hammonds*, 651 S.W.2d at 539; *State v. Roberts*, 838 S.W.2d 126, 131 (Mo. App. E.D.1992). Even where, as here, the error was not properly preserved, we have found that such intentional misconduct constituted manifest injustice mandating reversal. *Hammonds*, 651 S.W.2d at 539, *citing, State v. Williams*, 646 S.W.2d 107 (Mo. banc 1983).

In determining whether the prosecutor's comments in this case were sufficiently prejudicial to require reversal, we have reviewed the facts of other cases involving similar types of prosecutorial misconduct. We find that the prosecutor's comments during the presentation of evidence and during his closing arguments in this case are most closely analogous to those made by the prosecutor in *State v. Luleff*, 729 S.W.2d 530 (Mo.App. E.D. 1987). In *Luleff*, the defendant was charged with receiving stolen property. At trial, the defendant attempted to introduce into evidence a receipt for the sale of the property. The prosecutor objected to the receipt as hearsay, and upon the defendant's subsequent effort to get the receipt into evidence under the business records exception, the prosecutor objected again. These objections were sustained by the trial court. *Id.* at 535. Unfortunately, in closing argument the prosecutor then stated:

PROSECUTOR: *Where's the receipt?*

DEFENSE: Objection again, Judge. He objected to the receipt.

THE COURT: Overruled.

PROSECUTOR: It's easy to say how he did it and so on. It's convenient if you're lying to tell you that, but you are supposed to make this decision based on facts and evidence. *Well, where's the receipt?*

*Id.* (emphasis added). And on rebuttal stated:

PROSECUTOR: Another thing—seven thousand eight hundred dollars cash, *no receipt.* And, how did we learn that? Did any of the State's witnesses say that? No, because we don't know how he got the tractor. The only person who knows, ladies and gentlemen, is this man right here. So, are you bound by what he told you up here? Are you bound that that is when he got it, that that is what he paid for it and that's how he got it? No, you twelve people can decide whether he's telling the truth and would he want to say that and why would he say that ... *there is a catch. "Did you get a receipt? No." So, are you bound by his testimony? I think not.*

*Id.* (emphasis added).

Thus, in *Luleff,* although the prosecutor knew that the defendant had a piece of paper he claimed was a receipt for the purchase of the stolen property he was charged to be in possession of, which the prosecutor had successfully caused to be excluded, the prosecutor represented to the jury that if it had existed defendant would have produced it, yet he did not do so. *Id.* at 536. Indeed, "[t]he comments were tantamount to an absolute denial of the existence of any such document. The remarks were not accidental, but were deliberate." *Id.* Relying on the principles set out in *Hammonds, Luleff* found that this misrepresentation constituted reversible error.

Of course, in *Luleff,* the objection to the argument was preserved. Not so in *Hammonds,* 651 S.W.2d at 538, however, on which *Luleff* relied. In *Hammonds,* de-

fendant was accused of robbery. He claimed he was at his uncle's house at the time of the robbery, and on the morning of trial tried to list his uncle as an alibi witness. The court refused to let the uncle testify because of the tardy disclosure of the witness. The uncle watched the proceedings, and the prosecutor asked defendant to identify his uncle during defendant's testimony. In closing argument, the prosecutor then commented on the fact that the uncle was in the courtroom, yet neither he nor any of the other people defendant claimed he had been with had testified.

*Hammonds* found the prosecutor's comments to constitute plain error resulting in manifest injustice despite the fact that defense counsel failed to sufficiently object to them, stating:

[t]he assistant prosecuting attorney intentionally misrepresented the facts and informed the jury that the witness did not testify because he did [not] want to perjure himself and the jury should consider that in determining the "believability and credibility" of the witnesses. The comment was not accidental, but was deliberate, and cannot be excused. In these circumstances, this constituted error affecting defendant's substantial rights resulting in manifest injustice.

*Hammonds,* 651 S.W.2d at 539.

■ Here, as in *Hammonds,* the prosecutor made positive misrepresentations to the jury that the documents showing Defendant Weiss received buy-out money did not exist. Yet, he knew that Defendant had tried to introduce the documents but he had successfully argued that they should be excluded as hearsay, and then had stated in closing argument:

He isn't sure of the amount, *there's no deposit slip, there are no bank statements, not a single witness. The bank has no record, the Department of Defense has no record. The defense has actually shown you not one single record, no payroll record, nothing, to*

*show that this other money even ever existed. Maybe it didn't.*

(emphasis added).

The intentional and deliberate nature of the prosecutor's misstatements in the instant case, and their prejudicial effect, was clearly on par with those in *Luleff* and *Hammonds*. In all three cases the prosecutor "intentionally misrepresented the facts." *Hammonds*, 651 S.W.2d at 538. In our case, moreover, it is evident that the prosecutor was thinking about the potential effect of the documents and how the jury would react to them at the time he objected to their admission, for he sought a ruling even before they became at issue so that the issue would not arise in front of the jury, since he did not want the jurors to think "I am trying to hide them." In fact, it appears from his later conduct, he did not want the jury to know that Defendant was trying to introduce these documents because he wanted to argue that the fact Defendant did not introduce them meant they did not exist. This makes the prosecutor's conduct even more improper here.

We cannot say that this distasteful tactic did not affect the verdict, for had the jury believed Defendant's claim that these funds provided an alternate source for the money he claimed he thought he was withdrawing, it might have acquitted him. For these reasons, we find that the purposeful misconduct which the record reveals constituted plain error that affected Defendant's substantial rights, resulting in manifest injustice, and requires us to reverse and remand for a new trial.

Judge ROBERT G. ULRICH and Judge JAMES M. SMART, Jr. Concur.