STATE of Missouri, Respondent,

v.

Gregory S. BARLOW, Appellant.

No. WD 62681.

Missouri Court of Appeals,
Western District.

Feb. 28, 2005.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 3, 2005.

Application for Transfer Denied
May 31, 2005.

Rebecca Kurz, Kansas City, MO, for appellant.

Deborah Daniels, Assistant Attorney General, Jefferson City, MO, for respondent.

Before HOWARD, P.J.,
BRECKENRIDGE and ELLIS, JJ.

PATRICIA BRECKENRIDGE, Judge.

Gregory S. Barlow appeals his convictions and sentences for the class A felony of murder in the first degree, under section 565.020, RSMo 2000;[1] the felony of armed criminal action, under section 571.015; and the class C felony of arson in the second degree, under section 569.050. Mr. Barlow claims that the trial court erred in accepting the jury's guilty ver-

---

1. All statutory references are to the Revised Statutes of Missouri 2000.

dicts on each count because the court's polling procedure coerced a dissenting juror into agreeing with the other jurors. Mr. Barlow also claims the trial court plainly erred in permitting certain portions of the State's closing argument. Because this court finds that the polling procedure was not coercive and the trial court did not plainly err in permitting the State's closing argument, the judgment is affirmed.

## Factual and Procedural Background

Mr. Barlow does not challenge the sufficiency of the evidence to support his convictions. The evidence, in the light most favorable to the judgment, was that in late 2001, Mr. Barlow befriended Jack Meagher, whom he had met at a local restaurant. Mr. Barlow began doing handyman work for Mr. Meagher for pay. Two days before New Year's Day, Mr. Barlow moved into Mr. Meagher's house because Mr. Barlow was homeless at the time and living in a shelter. Their association soured after Mr. Barlow moved in, however, and he moved out of the house and back into the homeless shelter approximately two weeks later.

On January 21, 2002, Mr. Barlow returned to Mr. Meagher's house. While there, Mr. Barlow grabbed a hammer off of a bookshelf and struck Mr. Meagher in the head with it. He continued to strike Mr. Meagher even after Mr. Meagher had fallen to the ground, bleeding. Mr. Barlow struck Mr. Meagher in the head with the hammer at least ten times. During the attack, Mr. Meagher did not ever hit Mr. Barlow back. When he was finished striking Mr. Meagher, he sat down for a long time, unsure of what to do next.

Eventually, Mr. Barlow decided to wrap Mr. Meagher's body in Saran Wrap, cover it with a blanket, tie a rope around the blanket, and put the body in the trunk of Mr. Meagher's car. Mr. Barlow drove around, found a storm sewer, and threw Mr. Meagher's body in the storm sewer. Mr. Barlow then went back to Mr. Meagher's house, retrieved Mr. Meagher's Amoco card, and used it to buy gasoline. At some point, Mr. Barlow also changed his clothes. Mr. Barlow took the gasoline to Mr. Meagher's house, poured the gasoline all over the house, and set on fire the house and the clothes he was wearing when he murdered Mr. Meagher. Next, he drove around and tried to sell Mr. Meagher's car. When he was unable to sell the car, he parked it in a parking lot and left it. Mr. Barlow rinsed off the hammer and disposed of it in a convenience store trash can.

Meanwhile, members of the Kansas City Fire Department were dispatched to Mr. Meagher's home. They found heavy fire damage to all four sides of the home, and the roof had collapsed. The house was so badly damaged that the investigator was unable to determine the origin of the fire. Because Mr. Meagher's body was not discovered in the rubble of the house, his family made a missing person report with the Kansas City Police Department.

On January 24, 2002, Mr. Barlow drove up to the remains of Mr. Meagher's home and approached Mr. Meagher's niece, Michelle Tagg. Mr. Barlow told Ms. Tagg his name and said he was there to see if Mr. Meagher had any work for him because he needed the money. Mr. Barlow feigned surprise upon hearing that the house had burned down. He told Ms. Tagg that it had been a week and a half since he had last been to the house and, at that time, he and Mr. Meagher had argued. When Ms. Tagg asked him if he knew where Mr. Meagher might have gone, Mr. Barlow told her he thought Mr. Meagher had gone to Brazil to work for HUD. When questioned by the police a few weeks later, Mr. Barlow told a similar story and offered a

phony theory as to who might have started the fire.

Mr. Meagher's body was discovered in a sewer filtration system on February 6, 2002. On February 19, 2002, Mr. Barlow was again interviewed by the police. This time, however, he gave a detailed, video-taped confession in which he described the events leading up to the murder, the mur-der itself, and his actions afterwards. In his confession, he did not implicate anyone else in the murder. The State charged Mr. Barlow with one count of murder in the first degree, one count of armed crimi-nal action, and one count of arson in the second degree. A jury trial was held.

During the trial, Mr. Barlow's version of events changed entirely from that con-tained in his videotaped confession. Mr. Barlow testified that a man he had met at the homeless shelter, James Miles, had murdered Mr. Meagher. Mr. Barlow tes-tified that, on the night of the murder, he and Mr. Miles went to Mr. Meagher's house to pick up some of Mr. Barlow's clothes and ask for work. According to Mr. Barlow, when he went into Mr. Meagher's house, Mr. Meagher insulted him and his girlfriend. Mr. Meagher also started poking Mr. Barlow in the groin area. Mr. Barlow grabbed the hammer, and a struggle ensued. To defend himself, Mr. Barlow hit Mr. Meagher one time in the back of the head with the hammer. Mr. Barlow then dropped the hammer, and the two men continued to struggle. Ac-cording to Mr. Barlow, Mr. Meagher would not let go of him. At some point, Mr. Miles walked in, grabbed the hammer, and repeatedly hit Mr. Meagher in the head until he was dead. Because he was "kind of a little bit scared" by Mr. Miles' actions, Mr. Barlow claimed that he mere-ly went along with Mr. Miles' directions to dispose of Mr. Meagher's body in a storm sewer and burn down Mr. Meagher's

house. Mr. Barlow testified that he failed to mention Mr. Miles' involvement in the murder earlier because he was afraid of Mr. Miles.

The jury found Mr. Barlow guilty on all charges. The court accepted the jury's verdicts and sentenced Mr. Barlow to life imprisonment without the possibility of probation or parole for murder in the first degree; life imprisonment for armed crim-inal action; and seven years in prison for arson in the second degree. The sentence for armed criminal action was to run con-secutively to the sentence for murder in the first degree. Mr. Barlow appeals.

## No Error in Accepting Guilty Verdicts

In his first point, Mr. Barlow claims that the trial court erred in accept-ing the guilty verdicts because the court violated the procedure for questioning a dissenting juror during polling of the jury. After the court read the jury's verdicts, Mr. Barlow requested that the jury be polled. The court polled the jury:

> THE COURT: All right. Ladies and gentlemen, the Court's going to poll the jury. As I call your name, if you would, please answer yes or no whether the verdicts that were published were the verdicts to which you agreed. Mr. Reed?
>
> JUROR NO. 1: Yes.
>
> THE COURT: Mr. Willis?
>
> JUROR NO. 2: Yes.
>
> THE COURT: Mr. Tranchilla?
>
> JUROR NO. 3: Yes.
>
> THE COURT: Ms. McWilliams?
>
> JUROR NO. 4: No.
>
> THE COURT: Ms. Regan?
>
> JUROR NO. 5: Yes.
>
> THE COURT: Ms. Pennington?
>
> JUROR NO. 6 Yes.
>
> THE COURT: Ms. Knelt rolled. [sic]

JUROR NO. 7: Yes.

THE COURT: Ms. Overbay?

JUROR NO. 8: Yes.

THE COURT: Mr. Bingham?

JUROR NO. 9: Yes.

THE COURT: Mr. Smith?

JUROR NO. 10: Yes.

THE COURT: Mr. Larson?

JUROR NO. 11: Yes, sir.

THE COURT: Mr. McCreary?

JUROR NO. 12: Yes.

THE COURT: Ms. McWilliams?

JUROR NO. 4: Yes.

THE COURT: Was that your verdict? Did you agree to the verdicts that I read?

JUROR NO. 4: Yes.

THE COURT: All three of them?

JUROR NO. 4: Yes.

THE COURT: All right. Upon your unanimous decision, the Court will accept [the] verdicts of the jury in this cause, [and] will enter the same as the judgment in this case.

The court then thanked the jurors and discharged them. After the court recessed, defense counsel approached the bench and said, "Your Honor, it's clear there's ambiguity in the polling versus the verdict, at least in my mind, and for that reason I ask for a mistrial at this point." The court responded, "All right. The request for mistrial is denied. I did ask the juror that created the ambiguity a second time in fact several questions. As far as the Court's concerned there is no ambiguity, and I find it to be a unanimous verdict."

On appeal, Mr. Barlow argues that the trial court ignored the procedure required in Rule 29.01(d), which provides that if, upon polling a jury, "there is not unanimous concurrence, the jury may be directed to retire for further deliberation or may

be discharged." Mr. Barlow contends that the trial court's questioning of Ms. McWilliams was coercive because there was no ambiguity in her initial response that she did not agree with the verdicts and, by completing the polling and re-questioning her, the court placed additional pressure on her to agree with the other jurors.

 "A coerced verdict does not represent the jury's true unanimous concurrence." *State v. Dodd,* 10 S.W.3d 546, 552 (Mo.App.1999). The trial court's questioning a juror in open court about the juror's decision, however, is not "inherently coercive." *Id.* In reviewing the propriety of such questioning, this court "must distinguish between a trial court's effort to eliminate confusion and its attempt to compel a juror to change his vote or to coerce a unanimous verdict." *Id.* "A trial court errs if it continues to question a juror after that juror's answers clearly evince disagreement with the verdict." *Id.* If the juror's uncertainty is the product of confusion and not dissent, the trial court can question the juror "to obtain clarity." *Id.* The trial court is permitted to "make inquiry in a genteel, polite, non-leading and non-coercive manner that will clarify a juror's response." *State v. Hatch,* 724 S.W.2d 643, 645 (Mo.App.1986). "In evaluating the polling procedure, an appellate court must give deference to the views of the trial judge who was present at the scene on whether the juror's ultimate acquiescence in the verdict was free from pressure from the court." *Dodd,* 10 S.W.3d at 552.

In this case, the court heard from the foreperson that the jury had reached a unanimous verdict. Upon polling the jury, however, Ms. McWilliams' response of "No" indicated that the jury's verdict was not unanimous. Mr. Barlow argues that, at this point, the court could not question Ms. McWilliams further because her "No"

response clearly indicated her disagreement with the verdict. He relies on *State v. Conway*, 740 S.W.2d 320, 322–24 (Mo. App.1987), to support this argument. In *Conway*, the dissenting juror indicated three times that the guilty verdict was not her verdict and the trial court acknowledged that the juror was "clear on" what the court was asking her. *Id.* at 322–23. Yet, the trial court polled the remaining jurors and then further questioned the dissenting juror before the juror finally said that her verdict was guilty. *Id.* at 323. On appeal, the Eastern District of this court held that the polling procedure was coercive because the trial court had "received an unequivocal answer that [the juror] did not concur in the guilty verdict on Count II" but, nevertheless, further questioned the juror until it got the " 'right answer.' " *Id.* at 323–24.

That is not what happened here. The court's further questioning of Ms. McWilliams was not an attempt to coerce her into voting for a guilty verdict after she had repeatedly and unequivocally indicated that her vote was not guilty. Rather, the court's further questioning was an attempt to clarify what Ms. McWilliams' actual verdict was. "Rule 29.01(d) does not deny the trial court the right to inquire and determine if, in fact, there is a lack of unanimity...." *Hatch*, 724 S.W.2d at 645. There are occasions when, because of a juror's demeanor or tone of voice, a one-word response, like the "No" Ms. McWilliams gave in this case, may require clarification or confirmation. *See State v. Frederick*, 783 S.W.2d 469, 471–72 (Mo.App.1990) (permissible for trial court to clarify juror's initial "Yes" response); *Hatch*, 724 S.W.2d at 645 (permissible for trial court to clarify juror's initial "No" response); and *State v. Jackson*, 522 S.W.2d 317, 321 (Mo.App.1975) (permissible for trial court to clarify juror's initial "No" response). The trial court was permitted to inquire

further of Ms. McWilliams to clarify if, by her "No" response, she meant, "No, I did not agree to guilty verdicts." Indeed, the court's questions to Ms. McWilliams, "Was that your verdict?"; "Did you agree to the verdicts that I read?"; and "All three of them?," show that clarification was all the court was seeking. None of the questions were coercive, nor did the questions suggest, in any way, that the court was trying to compel Ms. McWilliams to change her vote to make the guilty verdicts unanimous. *See Hatch*, 724 S.W.2d at 645.

 Mr. Barlow also argues that the trial court's decision to finish polling the jury before further questioning Ms. McWilliams was coercive. Mr. Barlow again relies on *Conway*, which stated that the trial court "should promptly question a juror to clarify the verdict prior to completing the poll. Otherwise a juror could feel pressured by the court or his co-jurors to reach a unanimous verdict...." 740 S.W.2d at 324. While immediately questioning a juror to dispel confusion may be preferable, *Conway* did not deem it *per se* reversible error to continue the poll before seeking clarification of a juror's response. Moreover, the majority of courts from other jurisdictions that have addressed this issue did not deem continued polling *per se* reversible error but, rather, considered the facts and circumstances of each case to determine whether the polling procedure was coercive. *See, e.g., United States v. Gambino*, 951 F.2d 498, 501–02 (2nd Cir.1991); *United States v. Fiorilla*, 850 F.2d 172, 176 (3rd Cir. 1988); *Amos v. United States*, 496 F.2d 1269, 1272–73 (8th Cir.1974); *State v. McCrimmon*, 187 Ariz. 169, 927 P.2d 1298, 1301 (1996); *State v. Keaulana*, 71 Haw. 81, 784 P.2d 328, 329 (1989); *State v. Lee*, 131 Idaho 600, 961 P.2d 1203, 1209–10 (Ct.App.1998). *Contra United States v. Spitz*, 696 F.2d 916, 917 (11th Cir.1983).

One of the circumstances deemed significant in *Gambino, Fiorilla, Amos,* and *Lee,* all of which involved polling rules virtually identical to Missouri's Rule 29.01(d),[2] was the lack of a contemporaneous objection by defense counsel to continued polling. *Gambino,* 951 F.2d at 501–02; *Fiorilla,* 850 F.2d at 176; *Amos,* 496 F.2d at 1273; *Lee,* 961 P.2d at 1210. The lack of a contemporaneous objection "permits an inference that the procedures utilized did not appear coercive at the time." *Amos,* 496 F.2d at 1273. All of the circumstances in this case, including Mr. Barlow's failure to object contemporaneously to continued polling, support a finding that Ms. McWilliams was not pressured into acquiescing in the guilty verdicts. The polling procedure was not coercive. Mr. Barlow's first point is denied.

### No Plain Error in State's Closing Argument

In his second point, Mr. Barlow claims that the trial court plainly erred when it allowed the prosecutor to argue that there was no evidence, other than Mr. Barlow's testimony, that Mr. Miles was responsible for the murder of Mr. Meagher and to argue that Mr. Barlow was responsible for all ten blows to Mr. Meagher's head. Mr. Barlow asserts that the State's argument was plain error because evidence in support of Mr. Barlow's defense, a statement Mr. Miles had made to police, was excluded by the trial court when the State objected to its admission. Mr. Barlow argues that, "[e]ven though Missouri law clearly prohibits a prosecutor from arguing an adverse inference from a defendant's failure to present evidence which was excluded by the trial court," the State deliberately and improperly asserted that there was no evidentiary support for Mr. Barlow's defense when the State knew that the supporting evidence existed but was excluded by the court.

Mr. Barlow's defense at trial was that Mr. Miles was the "ring leader" and primarily responsible for Mr. Meagher's murder and "subsequent attempts to cover up the homicide." Mr. Barlow testified that his involvement in disposing of Mr. Meagher's body and setting fire to his house was motivated by fear. In closing argument, he characterized Mr. Miles, not Mr. Barlow, as the "cold-blooded killer" who, fortunately, was in jail.

In support of this defense, during trial, Mr. Barlow attempted to elicit testimony about a statement Mr. Miles made to the police in which he incriminated himself. The State objected to evidence of the statement because it was inadmissible hearsay. In an offer of proof, Mr. Barlow presented evidence that, in Mr. Miles' statement to police, he admitted that he hit Mr. Meagher on the left side of his forehead two or three times with the claw end of a hammer to put him "out of his misery" and that it was his idea to dispose of Mr. Meagher's body in a storm sewer. In arguing that Mr. Miles' statement was admissible, defense counsel argued that he was not offering Mr. Miles' statement for the truth of the statements, but instead to "show what [the] detective did in terms of his integrity of the investigation." After the offer of proof and argument of counsel,

2. *Gambino, Fiorilla,* and *Amos* involved Federal Rule of Criminal Procedure 31(d), which provides, in pertinent part:

> **(d) Jury Poll**.... If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury.

*Lee* involved Idaho Criminal Rule 31(d), which provides, in pertinent part:

> **(d) Poll of Jury**.... If upon the poll there is *not unanimous concurrence,* the jury may be directed to retire for further deliberations or it may be discharged.

the trial court sustained the State's objection. In its ruling, the court stated it was excluding Mr. Miles' statement because it was not exculpatory, citing *State v. Hutchison*, 957 S.W.2d 757, 761 (Mo. banc 1997). Mr. Miles' statement was marked as an exhibit and made a part of the record for the offer of proof.

On appeal, Mr. Barlow does not challenge the trial court's ruling excluding Mr. Miles' statement. Instead, he claims that the trial court should have, *sua sponte,* taken action to prevent the State from arguing in closing that there was no evidence to support Mr. Barlow's defense that Mr. Miles was the "ring leader" in the murder and that Mr. Barlow was responsible for all ten blows to Mr. Meagher and must have deliberated because of the number of blows. The specific statements about which Mr. Barlow complains were made by the State in its rebuttal closing argument. The prosecutor stated:

> Ladies and gentlemen, before we get into the deliberate acts of [Mr. Barlow], let's address this information about Miles. *There's no evidence to support this Miles accusation. The only evidence you have is coming from this defendant.* The guy, you could tell by his actions and his words on the stand[,] wasn't telling you the truth today. This is a case about actions and words, and let's think about this defendant's actions and words.

The prosecutor went on to discuss Mr. Barlow's disposing of Mr. Meagher's body, destroying the crime scene, attempting to sell Mr. Meagher's car, communicating to Mr. Meagher's relatives that he did not know what happened to Mr. Meagher, and Mr. Barlow's lying to the police. The prosecutor next addressed the issue of deliberation:

> Ladies and gentlemen, there's no doubt that there's deliberation. When does the deliberation clock start to tick? Does it start to tick when he's going over there? Yeah. But you don't believe that. Does it start to tick as a big, young 28–year–old man stands in front of a 61–year–old smaller man and walks over to a bookshelf and grabs a hammer. {Snaps}. No matter how brief. Deliberation.
>
> If you don't believe—does deliberation happen the first time he raises that hammer? This guy, raises that hammer and strikes the victim in the head? {Snaps}. What about two, three—and remember, this is a hammer on a 61–year–old man's head. He's not standing.
>
> You heard Dr. Young. There's no defensive wounds. He got thumped and he dropped.
>
> Hit No. 2, 3, 4, all the way through to at least 10. The deliberation clock started to tick way before that. This isn't an act of a man who just snapped out of rage. The guy doesn't have a nick on his shoulders, on his back, his stomach. Everything was concentrated right on his head.
>
> *He was deliberate. He was cool. He knew what he was doing. I'm going to kill this man. I'm going raise this hammer not once but at least ten times, and I'm going to smash his head.*

(Emphasis added.)

 Mr. Barlow did not object to these remarks by the prosecutor, nor did he include them in his motion for new trial. Accordingly, Mr. Barlow requests plain error review. A claim that is not properly preserved is reviewable only for plain error. Rule 30.20. Plain error relief is appropriate only if this court determines that Mr. Barlow has suffered a "manifest injustice or a miscarriage of justice" as a result of the alleged error. *Id.* "Relief should rarely be granted on asser-

tions of plain error committed during closing arguments." *State v. Barnett,* 980 S.W.2d 297, 306 (Mo. banc 1998). This is because improper comments made during closing argument usually do not affect the substantial rights of a defendant. *State v. Strubberg,* 616 S.W.2d 809, 818 (Mo. banc 1981). The improper argument must have had "a decisive effect on the jury's determination" to constitute plain error. *State v. Hall,* 982 S.W.2d 675, 683 (Mo. banc 1998).

 Mr. Barlow argues that the State's argument constituted an improper comment on excluded evidence. A prosecutor is not permitted "to 'comment on or refer to evidence or testimony that the court has excluded.' " *State v. Weiss,* 24 S.W.3d 198, 202 (Mo.App.2000). In particular, the State may not intentionally misrepresent the facts in closing argument by informing the jury that no evidence exists when evidence was offered by the defendant but the State successfully caused the evidence to be excluded. *Id.* at 203–04. "Whether that error requires reversal depends on the circumstances of the particular case, and particularly on the strength of the other evidence and whether the prosecutor intentionally misrepresented the facts in making the comment." *Id.* at 202.

Looking first at the prosecutor's comment, "There's no evidence to support this Miles accusation. The only evidence you have is coming from this defendant," Mr. Barlow argues that this is a deliberate misrepresentation because the State knew that Mr. Miles' excluded statement would support Mr. Barlow's defense that Mr. Miles was the ring leader in Mr. Meagher's murder. In his statement to police, Mr. Miles admitted that he hit Mr. Meagher in the head two or three times with the claw end of the hammer after Mr. Barlow's blows to put Mr. Meagher "out of his misery" and that it was his idea to dispose of the body in a storm sewer.

Contrary to Mr. Barlow's assertions, however, Mr. Miles' admissions in his excluded statement did not support the theory that Mr. Miles was the "ring leader" in the murder. These admissions would have shown only that Mr. Miles joined Mr. Barlow in the murder and participated in covering up the murder. Contrary to Mr. Barlow's characterization of Mr. Miles as the "ring leader," Mr. Miles' excluded statement to the police was that, prior to going to Mr. Meagher's house, Mr. Barlow told him that Mr. Meagher was a child molester and was not treating Mr. Barlow right, and that Mr. Barlow was thinking about "just getting rid of him altogether." Mr. Miles said that Mr. Barlow told him "how he wanted to do it" and that Mr. Barlow "was gonna take care of the whole thing and [Mr. Miles] had nothing to worry about." Mr. Miles said that Mr. Barlow also told him that "he was a green beret and he knew how to do this and he knew how to do that and that he would be just a few seconds" in killing Mr. Meagher.

 The only evidence that Mr. Miles was the "ring leader" did, in fact, come from Mr. Barlow, who made such a claim in his direct testimony. Therefore, the prosecutor's comment that there was no evidence to support Mr. Barlow's accusation about Mr. Miles, other than Mr. Barlow's testimony, was not a misrepresentation of excluded evidence but, rather, was based on the evidence presented at trial. "Prosecutors are entitled to argue matters supported by the evidence or matters reasonably inferable from the record." *State v. Mease,* 842 S.W.2d 98, 110 (Mo. banc 1992). "That includes pointing out to the jury an absence of evidence to support a theory suggested by the defendant." *Id.* The trial court did not plainly err in permitting this argument.

The other comment Mr. Barlow alleges was improper was the prosecutor's argument, "He was deliberate. He was cool. He knew what he was doing. I'm going to kill this man. I'm going to raise this hammer not once but at least ten times, and I'm going to smash his head." Mr. Barlow contends this comment was a misrepresentation of excluded evidence because it implied that he was responsible for all of the blows to Mr. Meagher's head. In Mr. Miles' excluded statement, he admitted that he hit Mr. Meagher two or three times with the hammer after Mr. Barlow did. Mr. Barlow claims that a reasonable inference from Mr. Miles' excluded statement was that Mr. Barlow did not intend to kill Mr. Meagher with his blows, but Mr. Miles intended to and did kill Mr. Meagher with his two or three blows.

Contrary to Mr. Barlow's claim, the argument by the State concerning whether Mr. Barlow deliberated was not an intentional misrepresentation that there was no evidence when excluded evidence existed. These challenged comments occurred when the State was arguing that the evidence at trial supported a finding that Mr. Barlow had deliberated. There was no statement in this portion of the argument that there was no evidence, other than Mr. Barlow's testimony, that anyone else struck Mr. Meagher with the hammer. The evidence at trial, particularly Mr. Barlow's videotaped confession, fully supported the State's theory that it was Mr. Barlow who intentionally killed Mr. Meagher by repeatedly striking him with the hammer. Mr. Barlow confessed that he took the hammer and hit Mr. Meagher "a lot," causing Mr. Meagher to fall to the ground. Mr. Barlow further admitted that he continued to hit Mr. Meagher, who was unarmed and bleeding, even· after Mr. Meagher had fallen to the ground. The prosecutor's comment, that Mr. Barlow coolly and deliberately smashed Mr. Meagher's head with a hammer ten times with the intent to kill him, was a reasonable inference from this evidence and was not a misrepresentation of excluded evidence. The State was entitled to argue ·the evidence and all reasonable inferences from the evidence. *Mease*, 842 ·S.W.2d at 110. The trial court did not plainly err in permitting this argument.

The judgment is affirmed.

All concur.