

# SUPREME COURT OF MISSOURI
## en banc

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | *Opinion issued July 16, 2019* |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | No. SC96924 |
| | ) | |
| CRAIG M. WOOD, | ) | |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY**
The Honorable Thomas Mountjoy, Judge

Craig Wood appeals a judgment finding him guilty of one count of first-degree murder, § 565.020, RSMo 2000, and sentencing him to death.[1] This Court has exclusive appellate jurisdiction. Mo. Const. art. V, § 3. The judgment is affirmed.

## Factual and Procedural Background

On the afternoon of February 18, 2014, Carlos and Michelle Edwards saw 10-year-old Hailey Owens walking down the sidewalk near their home in Springfield. A tan Ford Ranger truck drove past Hailey, turned around, and pulled alongside her. The driver, later identified as Wood, asked Hailey for directions. As Hailey began to walk away, Wood

---

[1] All statutory citations are to RSMo 2016 unless otherwise indicated.

opened the door and told her to come back. Hailey turned and stepped toward the truck. Wood lunged at Hailey, and pulled her into the truck. Mr. Edwards ran toward the truck, yelling at Wood to stop. Wood sped away. Mrs. Edwards called 9-1-1 to report the incident and the truck's license plate number. The truck was registered to Wood's parents, but Wood was the primary driver.

Springfield police officers surveilled Wood's home. They observed a tan Ford Ranger truck pull into the driveway. The truck's license plate number matched the number Mrs. Edwards reported. As an officer approached, Wood exited the truck and tossed a roll of duct tape into the truck bed. Wood, nervous and smelling of bleach, acknowledged he knew why the officers were there.

Wood voluntarily accompanied officers to police headquarters. Wood admitted the Ford Ranger was his, but declined to answer any questions regarding Hailey's location. Officers observed an abrasion and dried blood on Wood's lower lip, dried blood on one of his fingers, and red vertical marks on his neck and near his groin. His hat appeared to have bleach stains. Wood told officers he made two trips to Walmart earlier in the day to purchase bleach and drain cleaner. Wood also said he went to a laundromat, and his laundry was still there.

Officers went to Wood's house to look for Hailey. They entered through an unlocked back door. A strong odor of bleach emanated from the basement. The basement steps and floor were wet. A fan was running, and a scrap of duct tape was on the floor. There were empty bleach bottles and several plastic storage tubs. The officers secured the house and left.

2

After obtaining a search warrant, the officers returned and fully searched Wood's home. Wood's bed was stripped of sheets and blankets. On the bedroom dresser, police found a folder containing two handwritten stories detailing fantasies of sexual encounters between an adult male and 13-year-old girls. The folder also contained photographs of girls who were students at the middle school where Wood worked as an aide and football coach.

In the basement, the officers found Hailey's nude body wrapped in black plastic bags, stuffed into a 35-gallon plastic tub. Hailey's body, stiffened from rigor mortis, was wet and smelled of bleach. Her lips, cheek, and ear were bruised. Ligature marks indicated Wood tied Hailey by the wrists, and she struggled to free herself. A .22-caliber shell casing lay on the basement floor. The shell casing was fired from a .22-caliber rifle locked inside a gun safe in a storage room.

An autopsy showed Hailey died from a gunshot to the back of her neck, killed by a .22-caliber bullet that passed through the base of her brain. Wood fired the fatal shot from point blank range, placing the barrel of the gun on the back of Hailey's neck before pulling the trigger. Hailey's vagina and anus were lacerated and bruised in a manner consistent with sexual assault.

While Wood had locked the murder weapon away in a safe, officers found several guns larger than .22-caliber and several shotguns left in open view throughout Wood's home. In the bedroom, officers found a shotgun leaning against the wall and a larger caliber handgun on the nightstand next to the bed. An FBI agent testified the .22-caliber rifle would make less noise and less mess than other weapons found in the house.

3

Officers discovered Hailey's clothing in a dumpster behind a strip mall near Wood's home. Surveillance video showed Wood placing Hailey's clothes in the dumpster. A receipt in Wood's truck showed he purchased a laundry bag and duct tape from Walmart on the evening of Hailey's murder. Police also obtained video footage from Walmart showing Wood purchased bleach and drain cleaner approximately an hour after abducting Hailey.

Wood did not testify or present evidence during the guilt phase. During guilt phase opening statements, Wood's counsel argued Wood did not deliberate before killing Hailey. The state's closing argument emphasized the evidence showing Wood purposely and deliberately killed Hailey. The state argued, "I submit to you that when you place the muzzle, the end of the barrel of a gun, against the back of the base of the skull and you pull the trigger, there's only one purpose you can have, and that's to kill someone. Your common sense tells you that." The state argued Wood deliberately killed Hailey because he chose "the smallest caliber weapon he has, that will make the least mess and the least noise," and then locked the murder weapon away in a gun safe. The state concluded that considering this evidence in conjunction with evidence Wood attempted to conceal his crime by stripping the sheets from his bed, bleaching and hiding Hailey's body, and disposing of her clothes in a dumpster behind a strip mall proved beyond a reasonable doubt Wood deliberately killed Hailey. The jury found Wood guilty of murder in the first degree.[2]

---

[2] In addition to one count of first-degree murder, the state charged Wood with one count of armed criminal action, § 571.015, RSMo 2000, one count of child kidnapping, § 565.115, RSMo Supp.

During the penalty phase, the state presented a detective's testimony that he found no connection between Wood and Hailey or her family. A computer forensic examiner testified that after an Amber alert was issued for Wood's truck, a friend sent a text message to Wood asking "You haven't been hunting, have you." Another friend texted, "Oh, great, I just got an Amber Alert about a gold Ford Ranger. What have you and bear done???" Wood's dog was named Bear.

The state presented victim impact testimony from the mother of one of Hailey's friends, Hailey's teacher, her great-grandmother, two aunts, and a pastor. The witnesses testified Hailey was a happy and loving child. Hailey's death left an "unfillable void" in her family and traumatized her brother. Hailey's teacher testified that, after Hailey's murder, her classmates' behavior changed and they struggled to cope with Hailey's death. Hailey's aunt testified more than 10,000 people attended a vigil for Hailey. The pastor testified "countless parents" told him they no longer allowed their children to play unsupervised in their front yards or walk to a friend's house.

Wood presented testimony from his parents, three friends, a priest, and two guards from the Greene County jail. Wood's parents testified regarding Wood's problems with depression and substance abuse, but noted he was employed consistently and had no significant criminal history. Wood's friends testified they were shocked when he was arrested because such a crime was out of character. One friend noted Wood once saved a

2004, one count of first-degree rape, § 566.030, RSMo Supp. 2013, and one count of sodomy, § 566.060, RSMo Supp. 2013. The state proceeded to trial only on the murder count. Because of intensive pretrial publicity, a jury was chosen from Platte County.

man from an apartment fire. None of Wood's friends were aware he had sexual fantasies about young teenage girls. The priest testified that, since his arrest, Wood renewed his faith, studied the Bible, and regularly met to discuss what he had done. The jail guards testified that, aside from hoarding pills for an apparent suicide attempt, Wood caused no problems.

The jury found the following statutory aggravating circumstances beyond a reasonable doubt:

> The murder of Hailey involved torture and depravity; that the defendant killed Hailey after she was bound or otherwise rendered helpless by the defendant, and the defendant thereby exhibited a callous disregard for the sanctity of all human life;

> The defendant's selection of the person he killed was random and without regard to the victim's identity and that defendant's killing of Hailey thereby exhibited a callous disregard for the sanctity of human life;

> The murder of Hailey was committed for the purpose of avoiding arrest;

> The murder of Hailey was committed while the defendant was engaged in rape;

> The murder of Hailey was committed while the defendant was engaged in sodomy;

> The murder of Hailey was committed while the defendant was engaged in kidnapping;

> Hailey was a witness or potential witness of a pending investigation of the kidnapping of Hailey.

The jury unanimously found the foregoing aggravating circumstances but deadlocked on punishment. The jury did not unanimously determine the mitigating circumstances outweighed the aggravating circumstances.

6

Because the jury deadlocked on punishment, the circuit court determined the appropriate sentence as required by § 565.030.4. The circuit court specifically referenced the six aggravating circumstances found unanimously by the jury and stated it "does accept and agrees with the factual findings of the jury as set forth in its verdict as to punishment." The circuit court then determined "the facts and circumstances in mitigation of punishment were not sufficient to outweigh facts and circumstances in aggravation of punishment." Finally, "based upon factual findings of the jury," the court determined death was the appropriate sentence.

Wood presents nine points on appeal challenging the circuit court's evidentiary rulings, the state's closing argument, the decision to strike a juror for cause, and the constitutional validity of § 565.030 and § 565.032 governing Missouri's death penalty procedure.[3]

## I. Evidentiary Claims

Wood raises four points asserting the circuit court erred by overruling his objections to the admission of evidence. "A trial court has broad discretion to admit or exclude evidence during a criminal trial, and error occurs only when there is a clear abuse of this discretion." *State v. Hartman*, 488 S.W.3d 53, 57 (Mo. banc 2016) (internal quotation omitted). "A trial court abuses its discretion only if its decision to admit or exclude evidence is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful,

---

[3] For organizational purposes, Wood's points on appeal are addressed out of order.

deliberate consideration." *State v. Blurton,* 484 S.W.3d 758, 769 (Mo. banc 2016) (internal quotation omitted). "This Court will reverse the trial court's decision only if there is a reasonable probability that the error affected the outcome of the trial or deprived the defendant of a fair trial." *Id*.

## A. Cell phone photographs properly admitted

Wood claims the circuit court abused its discretion during the guilt phase by overruling his objection to the admission of 32 photographs from Hailey's cellphone. The circuit court reviewed the photographs before overruling Wood's objection and concluded they were relevant and admissible.

The photographs were taken from 11:10 a.m. to 4:40 p.m., just minutes before Wood abducted Hailey. The photographs depicted Hailey, her dog, family, friends, stuffed animals, the neighborhood where she was walking, and her friend's handwritten lyrics to a popular song. Wood argues the photographs were improper victim impact evidence during the guilt phase because most of the photographs were cumulative and had no logical or legal relevance to disputed facts pertaining to the murder charge.

"Evidence must be logically and legally relevant to be admissible." *State v. Prince*, 534 S.W.3d 813, 817 (Mo. banc 2017). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." *Id.* (internal quotation omitted). "Evidence is legally relevant when the probative value of the evidence outweighs unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *State v. Taylor,* 466 S.W.3d 521, 528 (Mo. banc 2015) (internal quotation omitted). "Photographs are relevant if they depict the crime scene, the victim's identity,

8

the nature and extent of the wounds, the cause of death, the condition and location of the body, or otherwise constitute proof of an element of the crime or assist the jury in understanding the testimony." *State v. Collings*, 450 S.W.3d 741, 762 (Mo. banc 2014) (internal quotation omitted).

The disputed element during the guilt phase was deliberation. Section 565.002(3), RSMo 2000, defined deliberation as "cool reflection for any length of time no matter how brief."[4] The element of deliberation may be proven by the circumstances surrounding the crime. *Collings*, 450 S.W.3d at 760. Although Wood admitted he killed Hailey, "the state, having the burden of proving defendant's guilt beyond a reasonable doubt, should not be unduly limited in its quantum of proof." *State v. Griffin*, 756 S.W.2d 475, 483 (Mo. banc 1988).

The photographs of Hailey and the neighborhood where she was walking were logically and legally relevant because they assisted the jury with understanding the circumstances surrounding the crime. The photographs confirmed the timeline of events and showed Hailey was wearing the same clothing Wood later discarded in the dumpster. Wood's attempt to dispose of Hailey's clothing and conceal the crime supports an inference of deliberation. *See State v. Tisius*, 92 S.W.3d 751, 764 (Mo. banc 2002). Finally, the photographs assisted the jury with understanding the nature and extent of the injuries Wood inflicted on Hailey by showing she lacked any significant injuries prior to the abduction. The fact Hailey lacked injuries prior to the abduction assisted the jury with understanding

---

[4] Section 565.002 was amended effective January 1, 2017. The definition of "deliberation" remained the same but is now found in § 565.002(5).

9

the multiple injuries Wood inflicted, including ligature marks indicating Hailey struggled to free herself. Evidence of multiple injuries and prolonged struggle are relevant to the state's burden of proving the disputed element of deliberation beyond a reasonable doubt. *Id.* The photographs were relevant and admissible.

To the extent the photographs of Hailey's stuffed animals, pets, family, and song lyrics are less relevant, the issue is whether the allegedly erroneous evidentiary ruling was so prejudicial that there is a reasonable probability it affected the outcome of the trial. *Hartman*, 488 S.W.3d at 57. The state briefly mentioned the photographs in the guilt phase closing argument to establish the timeline of events and the fact Hailey had no injuries before Wood abducted her. The state's argument, therefore, was limited to referencing the most relevant photographs. In any event, the overwhelming weight of the evidence clearly established deliberation, and negates any reasonable probability the outcome would have been different even if the circuit court had excluded some of the less logically relevant photographs.[5]

**B. Gun evidence properly admitted**

Wood claims the circuit court abused its discretion by admitting photographs and testimony regarding firearms, ammunition, and related items found in his home. Wood argues the evidence was logically irrelevant and prejudicial because the only possible

---

[5] Wood argues the photographs may have affected the jury's subsequent deliberations in the separate penalty phase. This speculative argument fails because the circuit court did not abuse its discretion by admitting the photographs in the guilt phase.

purpose was to show he was a "gun-crazed, dangerous person with a propensity for violence."

Evidence of weapons not connected to the accused or the offense at issue are generally inadmissible. *State v. Hosier*, 454 S.W.3d 883, 895 (Mo. banc 2015). Because Wood's sole defense during the guilt phase was lack of deliberation, the state's case hinged on showing deliberation. The evidence of firearms of varying calibers and gauges found throughout Wood's home shortly after he killed Hailey was logically and legally relevant to show deliberation because it tended to prove Wood deliberately chose the smallest weapon from his collection to facilitate his efforts to cover up the murder. In addition to Wood foregoing the multiple weapons stored throughout the house, the evidence also showed that in the bedroom where the evidence suggested Wood raped Hailey, officers found a shotgun leaning against the wall and a large-caliber handgun on the nightstand next to the bed. Wood used neither one of those readily accessible weapons. Instead, Wood used the small, .22-caliber rifle officers found locked in a gun safe in the basement. The state made precisely this point during closing argument:

> He deliberately unloads and hides the rifle. Do you remember all those guns he had around of a higher caliber? In fact, when he's raping her in the bedroom, he's got a handgun right there he could have used. Does he use that? No, he doesn't. He chooses the smallest caliber weapon he has, that will make the least mess and the least noise, and then he hides it in the gun safe, doesn't leave it out like the other guns, and he unloads that magazine.

The state's closing argument emphasized and was consistent with the fact the gun evidence was both logically and legally relevant to refute Wood's argument he did not deliberately kill Hailey. The dissenting opinion, by relying on fundamentally

11

distinguishable cases, overlooks the fact the logical and legal relevance was amplified by the number of weapons precisely because it showed Wood deliberately chose the .22-caliber rifle even though multiple other weapons were more readily accessible.[6] Further, unlike the cases cited by the dissenting opinion, any alleged prejudicial effect of the gun evidence "was minimized by admitting only photographs of the evidence, not the guns and ammunition themselves." *Id.* at 896. The circuit court did not abuse its discretion

---

[6] The dissenting opinion's argument that allowing the state to carry its burden of proving deliberation by showing Wood chose the smallest weapon from his large collection requires "jettisoning of decades of case law" is based on a misreading of that case law. Missouri law cautions against evidence of weapons ***unrelated*** to the offense, particularly when the weapons themselves are displayed to the jury. The cases cited by the dissent illustrate this principle. For instance, in *State v. Wynne*, 182 S.W.2d 294, 297 (Mo. 1944), the issuing opinion was "whether the appellant was unfairly and unjustly prejudiced by the prosecuting attorney's exhibition and demonstration with a pistol as he cross-examined her." This Court held the appellant was prejudiced because, "as the court told the jury, the .25-caliber gun in question had no connection whatever with the defendant or the crime." *Id.* at 299. Similarly, in *State v. Perry*, 689 S.W.2d 123, 124-25 (Mo. App. 1985), the court held the defendant was prejudiced by "admitting the loaded 20-gauge shotgun into evidence" because it had no relation to the defendant and the alleged robbery occurred "by means of a 'handgun' or 'pistol.'" In *State v. Charles*, 572 S.W.2d 195, 199 (Mo. App. 1978), the court of appeals reversed murder and robbery convictions because the circuit court erroneously permitted the state "to prove collateral criminal offenses never admitted or for which there was no conviction . . . by the admission of lethal weapons totally foreign to the offense for which an accused is standing trial." Finally, in *State v. Holbert*, 416 S.W.2d 129, 133 (Mo. 1967), this Court reversed a conviction for carrying a concealed weapon because the circuit court erroneously permitted the state to introduce two unrelated pistols into evidence, leave the pistols in bags on the counsel table, and pass the pistols to the jury for examination. In *Holbert*, the prejudice resulted from the fact the pistol recovered from the defendant's shirt pocket "was admitted without objection" and was "in no way connected with the present offense" involving a weapon recovered from the defendant's pants pocket. *Id.* Conversely, the photographs and testimony regarding weapons found throughout Wood's residence were both logically and legally relevant to the central, disputed element of deliberation.

12

by overruling Wood's objection to evidence of the firearms, ammunition, and related items found throughout his home.[7]

## C. Contents of folder properly admitted

Wood claims the circuit court abused its discretion by overruling his objection to evidence of the contents of the folder containing photos of four of Wood's female, middle school students and handwritten accounts of fictional sexual encounters with 13-year-old girls. Wood argues the photos and stories were inadmissible evidence of uncharged crimes relevant only for the impermissible purpose of showing his propensity to commit the offense.

It is unnecessary to address the merits of Wood's argument because a party can open the door to the admission of evidence "with a theory presented in an opening statement, or through cross-examination." *State v. Shockley*, 410 S.W.3d 179, 194 (Mo. banc 2013) (internal quotation and citation omitted). During opening statements, defense counsel argued the contents of the folder showed Wood acted out of compulsion, not deliberation, because his drug use unleashed suppressed sexual desire for young teenage girls. Wood argues defense counsel strategically chose to discuss the folder because the circuit court overruled his motion in limine to exclude the contents of the folder from evidence. But Wood's counsel recognizes a ruling on a motion in limine is interlocutory and subject to

---

[7] The dissenting opinion asserts "it appears the circuit court skipped" its "duty to weigh the probative value of each additional piece of gun evidence against the inherently prejudicial nature of gun evidence." The dissenting opinion improperly presumes the circuit court failed to analyze the evidence, even though the record confirms the circuit court considered the logical and legal relevance of this evidence when it considered Wood's motion in limine and when objections were made at trial.

change during trial.  *See Hancock v. Shook*, 100 S.W.3d 786, 802 (Mo. banc 2003).  Despite the interlocutory nature of the ruling, counsel chose to address the folder in opening statements, and one consequence of that strategic decision was to open the door to the admission of the evidence at trial.  *State v. Mickle*, 164 S.W.3d 33, 57 (Mo. App. 2005); *see also Bucklew v. State*, 38 S.W.3d 395, 401 (Mo. banc 2001) (concluding defense counsel opened the door to the admission of evidence the defendant previously committed an assault by mentioning background facts of the assault during opening statements).

## D. Victim impact evidence properly admitted

Wood claims the circuit court abused its discretion by overruling his objection to the state's penalty phase evidence regarding the effect of Hailey's murder on the Springfield community and allowing the state to question witnesses in a manner intended to elicit emotional responses.  Specifically, Wood challenges testimony that more than 10,000 people attended a vigil for Hailey, Hailey's murder changed Springfield from a town to a city, and "countless parents" indicated they feared for their children's safety.

"Victim impact evidence is admissible under the United States and Missouri Constitutions."  *State v. Driskill*, 459 S.W.3d 412, 431 (Mo. banc 2015).  "The state is permitted to show the victims are individuals whose deaths represent a unique loss to society and to their family and that the victims are not simply faceless strangers."  *Id.*  Further, § 565.030.4 provides penalty phase "evidence may include, within the discretion of the court, evidence concerning the murder victim and the impact of the offense upon the family of the victim and others."  "Victim impact evidence violates the constitution if it is

14

so unduly prejudicial that it renders the trial fundamentally unfair." *Driskill*, 459 S.W.3d at 431. (internal quotation omitted).

The testimony regarding the vigil was relevant to show Hailey's murder resulted in a "unique loss to society" and she was "not simply a faceless stranger[.]" *Id.* Similarly, the testimony that Hailey's murder changed Springfield from a town to a city and parents now feared for the children's safety was relevant to the impact of the offense on "the family of the victim ***and others***." Section 565.030.4 (emphasis added).[8] There is no specific constitutional limitation on the consideration of community impact, and § 565.030.4 broadly and expressly authorizes evidence of the impact on "others."

Finally, Wood's argument that the state's questioning was aimed solely at eliciting emotional responses fails because a defendant is not necessarily prejudiced by the fact some jurors or audience members in a murder trial exhibited emotional responses to admissible evidence. The circuit court considered the fact some jurors and an audience member wept, but concluded it was simply an "emotional response to the testimony which again I would put in the category of being natural. Nothing disruptive about it to anyone." In other words, the argument was "emotionally charged" because "the facts of this case are inherently emotionally charged." *State v. McFadden*, 391 S.W.3d 408, 425 (Mo. banc 2013). The evidence reflected the brutal facts of the case, and jurors and audience members

---

[8] Wood asserts the pastor's testimony regarding what parents told him was inadmissible hearsay. "To properly preserve an issue for an appeal, a timely objection must be made during trial." *State v. McFadden*, 369 S.W.3d 727, 740 (Mo. banc 2012) (internal quotation omitted). Wood did not preserve a hearsay argument because he did not make a specific hearsay objection to the pastor's testimony.

15

cannot be expected to share Wood's stoicism. The circuit court did not abuse its discretion by overruling Wood's objection to the penalty phase victim impact evidence.

## II. Closing Argument

Wood claims the circuit court plainly erred during the penalty phase closing argument by permitting the state to argue the jury could speak for Hailey and her family by sentencing Wood to death. Wood timely objected, but did not raise the issue in his motion for a new trial. "An issue is not preserved for appellate review if the issue is not included in the motion for a new trial." *State v. Clay,* 533 S.W.3d 710, 718 (Mo. banc 2017). This Court's consideration of Wood's claim is discretionary and limited to determining whether a plain error resulted in a "manifest injustice or miscarriage of justice[.]" Rule 30.20.

The threshold issue in plain error review is whether the circuit court's error was facially "evident, obvious, and clear." *State v. Jones*, 427 S.W.3d 191, 195 (Mo. banc 2014) (internal quotation omitted). If the appellant establishes a facially "evident, obvious, and clear" error, then this Court will consider whether the error resulted in a manifest injustice or miscarriage of justice. *Id.* To obtain a new trial on direct appeal based on a claim of plain error, the appellant must show "the error was outcome determinative." *State v. Baxter*, 204 S.W.3d 650, 652 (Mo. banc 2006) (internal quotation omitted). This Court rarely finds plain error in closing argument, and reversal is warranted only if the defendant shows the improper argument "had a decisive effect on the jury's determination." *McFadden*, 369 S.W.3d at 747 (internal quotation omitted). "The entire record is

considered when interpreting a closing argument, not an isolated segment." *Id*. (internal quotation omitted).

Before trial, Wood argued Hailey's mother should be allowed to testify she wanted Wood sentenced to life without parole. The state objected, arguing a family member's opinions regarding sentencing are inadmissible. The circuit sustained the state's objection, and none of Hailey's family members testified regarding their sentencing preferences.

During the penalty phase closing argument, the state recounted the circumstances of Hailey's death and argued the evidence warranted a death sentence. The state then asserted, "With your verdict, sentencing [Wood] to the ultimate punishment, you speak for Hailey. . . ." Wood objected. The state continued, stating, "You speak for her family . . . ." Wood once again objected. The circuit court overruled Wood's objection. The state continued, arguing Wood "not only brutalized Hailey, but he damaged her family, her brother, her school, her entire community, and changed our community, and your verdict will send a message to this defendant." The state concluded, "For all those harms, this is the case. This is the case that calls for the ultimate punishment, and I ask you to sentence the defendant to death."

Wood relies on *State v. Roberts*, 838 S.W.2d 126 (Mo. App. 1992), and *Bosse v. Oklahoma*, 137 S. Ct. 1 (2016), for the proposition the state's reference to Hailey and her family in closing argument resulted in a manifest injustice. Both cases are distinguishable.

In *Roberts*, the state's argument that the jury spoke for the victim's family was improper because there was no evidence the victim had any family members. 838 S.W.2d

17

at 131.  In this case, there was ample evidence of the devastating impact Hailey's murder had on her family.

In *Bosse*, the defendant objected to the state asking three of the victim's family members to recommend a sentence.  137 S. Ct. at 2.  All three testified and recommended death.  *Id.*  Under these circumstances, the United States Supreme Court held admitting evidence of the family's sentencing recommendations violated the Eighth Amendment.  *Id.* *Bosse* is distinguishable because none of Hailey's family members testified regarding their sentencing preference.

The crux of the state's argument was the brutality of Hailey's murder and its impact on her family and the community required the jury to "send a message" that such actions deserve a death sentence.[9]  "This Court has held that 'send a message' statements are permissible."  *McFadden*, 391 S.W.3d at 425.  Further, the state did not explicitly argue any of Hailey's family members wanted Wood to receive the death penalty.  The state's

---

[9] The dissenting opinion's argument rests on vigor alone, for it does not cite a single case holding that, during the course of a closing argument detailing the impact of the murder on the victim's family and community, a single sentence fragment referring to the victim's family constitutes plain error.  *Bosse* did not hold a fleeting reference to the family's wishes during closing argument results in plain error.  *Bosse* held it was error to permit three family members to testify directly to the jury that they wanted the defendant sentenced to death.  *Bosse*, 137 S. Ct. at 2.  In *State v. Barnett,* 103 S.W.3d 765, 772 (Mo. banc 2003), this Court held defense counsel was not ineffective for declining to call the victims' family to testify in favor of a life sentence because such evidence is "irrelevant."  In *State v. Williams*, 119 S.W.3d 674, 681 (Mo. App. 2003), the court of appeals found plain error because the circuit court erroneously excluded an exculpatory recording on the basis of a discovery sanction, and the state then argued there was no exculpatory evidence.  Finally, in *State v. Weiss*, 24 S.W.3d 198, 204 (Mo. App. 2000), the court of appeals held the state's misrepresentations regarding existence of possibly exonerating documents constituted plain error. As these cases illustrate, the dissenting opinion relies exclusively on materially distinguishable cases to take the extraordinary step of finding plain error in closing argument by divorcing the state's brief reference to Hailey's family from the broader context of a closing argument detailing the impact on the community.

isolated reference to speaking for Hailey and her family in the context of making a permissible "send a message" argument by imposing a death sentence did not change the outcome of this case. Wood has not shown a manifest injustice justifying the rare step of finding plain error based on statements made in closing argument. *State v. Anderson*, 79 S.W.3d 420, 439 (Mo. banc 2002) ("Statements made in closing argument will only rarely amount to plain error.").

### III. Juror Properly Stricken for Cause

Wood claims the circuit court abused its discretion by sustaining the state's motion to strike a venireperson for cause during the death qualification voir dire.

The circuit court's "ruling on a challenge for cause will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion." *State v. Deck*, 303 S.W.3d 527, 535 (Mo. banc 2010) (internal quotation omitted). "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *McFadden*, 369 S.W.3d at 738 (internal quotation omitted). "The qualifications for a prospective juror are not determined from a single response, but rather from the entire examination." *Deck,* 303 S.W.3d at 535.

In her jury questionnaire, the venireperson stated she opposed the death penalty. On a scale of one to seven, with one denoting strong opposition to the death penalty and seven denoting strong support, she rated her position as two. The venireperson explained she opposed the death penalty because she believed it was imposed disproportionately on

19

"poor people or minorities." She stated life without parole is the best option, and said she is a "very peaceful and non-violent believer." Finally, she stated the death penalty is "barbaric" and "We should not stoop to the level of a criminal. We are better than that."

During voir dire, the venireperson stated she could consider the death penalty, but reiterated she is "strongly against it in general" because it is not distributed fairly. She stated she did not believe the state commits a wrong by executing someone, but explained "we should not act as criminals ourselves in ending a life. I feel like, you know, it's – I guess I don't believe in the eye for an eye type of punishment. I'm not sure if that answers your question." She stated, "I could consider it even though I am, on principle, opposed in general." The venireperson stated, if she were jury foreman, her conscience would not permit her to sign a death verdict, but she could if it indicated the jury unanimously agreed to the verdict.

The state asked the venireperson if her conscience would "let you vote in favor of a death verdict?" She responded, "I think that's really what I meant, is my gut instinct is no, my conscience wouldn't – I'm against the death penalty." The state asked, "your gut instinct is you could not vote for it?" The venireperson responded "Yes, that's right."

During surrebuttal voir dire, the venireperson told defense counsel she did not believe in the death penalty and would have a very hard time making that call. She stated she would consider the death penalty if certain things fell into place and that she owed it to the victim to listen to both sides.

The state moved to strike the venireperson for cause. Wood objected. The circuit court sustained the state's motion. The court noted the venireperson's answers that her

20

conscience would not let her vote for the death penalty, and that she could consider the death penalty only because she owed it to the victim's family.

Just as the defendant has an interest in an impartial jury without an uncommon willingness to impose a death sentence, the state has a "strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes." *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (internal quotation omitted). When there is ambiguity in the venireperson's statements, the circuit court can resolve the ambiguity in favor of the state. *Id.; State v. Roberts,* 948 S.W.2d 577, 597 (Mo. banc 1997).

After a complete review of the juror questionnaire and the record of the entire examination rather than individual responses, the circuit court was faced with a situation on which it was uncertain whether the venireperson could "apply capital punishment within the framework state law prescribes." *Wheeler*, 136 S. Ct. at 460. The circuit court did not abuse its discretion by resolving the ambiguity in the state's favor and sustaining the state's motion to strike the venireperson for cause.

## IV. Constitutional Arguments

Wood claims § 565.030 violates his Sixth Amendment right to a jury trial by permitting the circuit court to impose a death sentence when the jury deadlocks on punishment. Wood also claims § 565.030 violates his right to be free from cruel and unusual punishment pursuant to the Eighth Amendment and article I, § 21 of the Missouri Constitution because the statute permits the circuit court to impose a death sentence following the jury's deadlock on punishment. Finally, Wood claims § 565.032 fails to sufficiently narrow the class of persons eligible for a death sentence.

21

"Challenges to the constitutional validity of a state statute are subject to de novo review." *State v. Shanklin*, 534 S.W.3d 240, 241 (Mo. banc 2017) (internal quotation omitted). "A statute is presumed constitutional and will be found unconstitutional only if it clearly and unambiguously contravenes a constitutional provision." *Id.* at 241-42 (internal quotation omitted). "The person challenging the validity of the statute has the burden of proving the act clearly and undoubtedly violates the constitutional limitations." *Id.* at 242 (internal quotation omitted).

**A. Sixth Amendment**

Section 565.030.4 establishes the procedure for the penalty phase of a first-degree murder trial when the state does not waive the death penalty. Assuming the defendant is not intellectually disabled, § 565.030.4(1), the defendant is eligible for a death sentence only when the jury finds at least one statutory aggravating circumstance beyond a reasonable doubt. § 565.030.4(2). When the jury finds a statutory aggravating circumstance, the jury proceeds to the weighing step, and must impose a life sentence if it "concludes" evidence in mitigation outweighs the evidence in aggravation. § 565.030.4(3). If the jury concludes the evidence in mitigation does not outweigh evidence in aggravation, the jury "decides" whether to "assess and declare the punishment at death." § 565.030.4(4). If the jury deadlocks on punishment, the circuit court determines punishment by following "the same procedure as set out in this section[.]" § 565.030.4. Wood argues this sentencing procedure violated his Sixth Amendment right to a jury trial because it permitted the circuit court to impose a death sentence following the jury's deadlock on punishment.

Wood's argument was considered and rejected by this Court. *State v. Shockley,* 410 S.W.3d 179, 198-99 (Mo. banc 2013). As in this case, the jurors in *Shockley* answered special interrogatories listing several statutory aggravators that they found unanimously beyond a reasonable doubt. *Id.* at 198. As in this case, the jurors in *Shockley* also stated they did not conclude unanimously that the mitigating circumstances outweighed those in aggravation. *Id.* Like Wood, Shockley argued § 565.030.4 violates the Sixth Amendment by permitting the circuit court, rather than the jury, to weigh the aggravators and mitigators and determine punishment if the jury is unable to reach a penalty phase verdict. *Id.* This Court held:

> Permitting a judge to consider the presence of statutory aggravators and to weigh mitigating evidence against that in aggravation in deciding whether to impose a death sentence when the jury did not unanimously agree on punishment does not negate the fact that the jury already had made the required findings that the State proved one or more statutory aggravators beyond a reasonable doubt and that it did not unanimously find that the factors in mitigation outweighed those in aggravation. Rather, the statute provides an extra layer of findings that must occur before the court may impose a death sentence.

*Id.* at 198-99. *Shockley* establishes that, when the jury finds the facts making a defendant eligible for a death sentence, the Sixth Amendment does not prohibit the circuit court from resolving the jury's penalty phase deadlock by imposing a death sentence. *Id.* at 199 n.11; *see also State v. McLaughlin*, 265 S.W.3d 257, 264 (Mo. banc 2008).

The jury unanimously found beyond a reasonable doubt the existence of six aggravating factors:

> The murder of Hailey involved torture and depravity; that the defendant killed Hailey after she was bound or otherwise rendered helpless by the

23

defendant, and the defendant thereby exhibited a callous disregard for the sanctity of all human life;

The defendant's selection of the person he killed was random and without regard to the victim's identity and that defendant's killing of Hailey thereby exhibited a callous disregard for the sanctity of human life;

The murder of Hailey was committed for the purpose of avoiding arrest;

The murder of Hailey was committed while the defendant was engaged in rape;

The murder of Hailey was committed while the defendant was engaged in sodomy;

The murder of Hailey was committed while the defendant was engaged in kidnapping;

Hailey was a witness or potential witness of a pending investigation of the kidnapping of Hailey.

The jury did not unanimously determine the mitigating circumstances outweighed the aggravating circumstances and deadlocked on punishment. The circuit court resolved the deadlock by accepting and reciting the jury's findings that the state proved six aggravating factors beyond a reasonable doubt. The circuit court then concluded the aggravating circumstances outweighed mitigating circumstances, and decided a death sentence was appropriate.

Wood argues this Court must reexamine *Shockley* and *McLaughlin* in light of *Hurst v. Florida*, 136 S. Ct. 616 (2016). Wood argues *Hurst* prohibits Missouri's death penalty by allowing the circuit court, following the jury's deadlock on punishment, to find the aggravating circumstances outweighed the mitigating circumstances. Wood's argument is that the weighing step is a factual finding constitutionally entrusted to the jury.

24

The Sixth Amendment, "in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt." *Alleyne v. United States*, 570 U.S. 99, 104 (2013). In addition to the facts underlying the charged offense, an "element" includes any fact that "expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict[.]" *Apprendi v. New Jersey,* 530 U.S. 466, 494 (2000). Therefore, "[w]hen a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury." *Alleyne*, 570 U.S. at 114-15.

In death penalty cases, the existence of an aggravating circumstance exposes the defendant to a greater punishment and, therefore, is a factual element the jury must find beyond a reasonable doubt. *Ring* v. *Arizona*, 536 U.S. 584, 604 (2002). In *Ring*, the statute at issue provided the trial judge could impose a death sentence only after independently finding at least one aggravating circumstance. *Id.* at 592-93. The statute violated the Sixth Amendment right to a jury trial because it authorized the trial judge alone to find aggravating circumstances making the defendant eligible for a death sentence. *Id.* at 609.

In *Hurst*, 136 S. Ct. 616, 624 (2016), the United States Supreme Court applied *Ring* to invalidate Florida's statutory death penalty sentencing procedure because it authorized "the judge alone" to find the existence of aggravating circumstances. Under Florida's procedure, the jury recommended an "advisory sentence" without specifying the factual basis for its recommendation. *Id.* at 620. Following the jury's advisory sentence, Florida's statute required the judge to impose a sentence of life imprisonment or death based on "the trial judge's independent judgment about the existence of aggravating and mitigating

25

factors[.]" *Id*. (internal quotation omitted). Because of the jury's limited, advisory role, Florida juries did "not make specific factual findings with regard to the existence of mitigating or aggravating circumstances," and the trial judge assumed the "central and singular role" in finding the facts necessary to impose a death sentence. *Id.* at 622. Given this procedural framework, the jury in *Hurst* found no specific aggravating circumstance, but nonetheless returned a non-unanimous advisory sentence recommending a death sentence. *Id.* at 620. The trial judge independently found the facts supporting two specific statutory aggravating circumstances and sentenced the defendant to death. *Id.*

*Hurst* held Florida's death penalty sentencing procedure violated the Sixth Amendment because it "**required the judge alone to find the existence of an aggravating circumstance**[.]" *Id.* at 624 (emphasis added). *Hurst* emphasized the limited scope of its holding by overruling *Spaziano v. Florida*, 468 U.S. 447 (1984), and *Hildwin v. Florida*, 490 U.S. 638 (1989), only "**to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty**." *Id.* (emphasis added). *Hurst* is a straightforward application of *Ring* and stands only for the proposition that, in a jury tried case, aggravating circumstances are facts that must be found by the jury beyond a reasonable doubt. *Hurst* does not hold the determination of whether mitigating factors outweigh aggravating factors or that death is an appropriate sentence are factual elements that must be found by a jury.[10]

---

[10] *See In re Bohannon*, 222 So. 3d 525, 531-33 (Ala. 2016) (*Hurst* requires only that the jury find the existence of an aggravating factor to make a defendant death eligible); *see also Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1198 (11th Cir. 2013) ("*Ring* does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances").

Wood's argument ignores the limited holding in *Hurst* and settled precedent that a death sentence requires two distinct determinations: "the eligibility decision and the selection decision." *Tuilaepa v. California*, 512 U.S. 967, 971 (1994). The eligibility decision is based on factual findings that the defendant has a conviction "for which the death penalty is a proportionate punishment" and the existence of an "aggravating circumstance (or its equivalent) at either the guilt or penalty phase." *Id.* at 971-72 (internal quotation omitted). The factual findings underlying the eligibility decision are verifiable; they either do or do not exist. *Kansas v. Carr*, 136 S. Ct. 633, 642 (2016). Unlike the factual findings underlying the eligibility decision, the selection decision requires the sentencer to consider "the character of the individual and the circumstances of the crime" and "relevant mitigating evidence[.]" *Tuilaepa*, 512 U.S. at 972. Once the jury finds the facts showing the defendant is eligible for a death sentence, the sentencer has "unbridled discretion" in making the selection decision. *Id.* at 979-80.

The selection decision is fundamentally different than the eligibility decision. "[T]he ultimate question [of] whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy[.]" *Carr*, 136 S. Ct. at 642. Unlike the factual finding that an aggravating circumstance does or does not exist, the selection decision is a discretionary judgment, and "jurors will accord mercy if they deem it appropriate, and withhold mercy if they do not, which is what our case law is designed to achieve." *Id.*[11]

---

[11] While *Tuilaepa* and *Carr* involved Eighth Amendment challenges to the burden of proof in death penalty sentencing, both cases establish the selection decision is not itself a factual element and is, instead, a discretionary judgment. These cases are instructive because the Sixth

Wood's case illustrates this concept. There is no factually verifiable answer to the question of whether Wood's lack of a significant criminal record and struggle with depression outweigh the fact he raped and sodomized Hailey before shooting her in the back of the neck at point blank range and discarding her body in a plastic tub. Neither a jury nor a judge can prove or disprove a conclusion the evidence on one side outweighs the evidence on the other. After the jury found the existence of multiple aggravating circumstances beyond a reasonable doubt, the determination of whether Wood's personal circumstances mitigated the brutality of his crime was a discretionary judgment call that neither the state nor federal constitution entrusts exclusively to the jury.[12]

This Court's decision in *State v. Whitfield*, 107 S.W.3d 253 (Mo. banc 2003), does not dictate a different result. In *Whitfield,* this Court applied *Ring* and recalled the mandate in a death penalty case because the jury did not decide all the facts necessary for a death sentence. 107 S.W. at 261-62. Although *Whitfield* properly recognized the existence or non-existence of an aggravating circumstance is a factual finding the jury must make, *Whitfield* erroneously suggested weighing the aggravating and mitigating circumstances is also a factual finding reserved for the jury. *Id.* at 261, 270. This Court's more recent cases corrected this aspect of *Whitfield*, and now uniformly recognize the weighing step is ***not*** a factual finding that must be found by the jury beyond a reasonable doubt.

---

Amendment requires only that the jury find the factual elements exposing the defendant to a greater punishment. *See Ring*, 536 U. S. at 604.

[12] Wood relies on *Rauf v. State*, 145 A.3d 430, 432-33 (Del. 2016), and *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), for his proposition that determining whether the aggravating circumstances outweigh the mitigating circumstances is a factual element the Sixth Amendment requires the jury to find. These cases are not binding, and both are wrongly decided.

28

In *Zink v. State*, 278 S.W.3d 170, 192-93 (Mo. banc 2009), this Court held appellate counsel was not ineffective for declining to argue the penalty phase instructions violated *Ring* and *Apprendi* by not instructing the jury to find beyond a reasonable doubt that mitigating circumstance outweighed aggravating circumstances. *Zink* held appellate counsel was not ineffective for declining to raise this "meritless" claim because the weighing step is not "a finding of a fact that may increase Mr. Zink's penalty. Instead, the jury is weighing evidence and all information before them." *Id*. at 193.

In *State v. Anderson*, 306 S.W.3d 529, 540 (Mo. banc 2010), this Court rejected the defendant's argument that the existence and weight of mitigating circumstances were facts that must be proven to the jury beyond a reasonable doubt. This Court reasoned *Ring* and *Apprendi* only require the state to prove beyond a reasonable doubt factual elements, including statutory aggravating circumstances. *Id.* Therefore, "neither the constitution nor the Missouri death penalty statute require that the State prove the weighing step beyond a reasonable doubt." *Id.*

In *State v. Dorsey*, 318 S.W.3d 648, 653 (Mo. banc 2010), this Court cited *Zink* and again held "**the jury's 'weighing' of the aggravation and mitigation evidence is not subject to proof beyond a reasonable doubt because it is not a factual finding that increases the potential range of punishment**." (Emphasis added). Similarly, in *State v. Nunley*, 341 S.W.3d 611, 626 n.3 (Mo. banc 2011), this Court noted a number of federal and state cases holding the weighing step is not a factual determination implicating the

29

Sixth Amendment right to a jury trial.[13] To the extent *Whitfield* presumes the weighing step is a factual finding constitutionally reserved for the jury, it should no longer be followed.[14]

---

[13] *Nunley* cited the following cases: *United States v. Sampson*, 486 F.3d 13, 32 (1st Cir. 2007) ("As other courts have recognized, the requisite weighing constitutes a process, not a fact to be found."); *United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005) (characterizing the weighing process as "the lens through which the jury must focus the facts that it has found" to reach its individualized determination); *Ford v. Strickland*, 696 F.2d 804, 818 (11th Cir. 1983) ("While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, ... the relative *weight* is not."); *Gray v. Lucas*, 685 F.2d 139, 140 (5th Cir. 1982) ("[T]he reasonable doubt standard simply has no application to the weighing of aggravating and mitigating circumstances."); *Higgs v. United States*, 711 F.Supp.2d 479, 540 (D. Md. 2010) ("Whether the aggravating factors presented by the prosecution outweigh the mitigating factors presented by the defense is a *normative* question rather than a *factual* one."); *State v. Fry*, 126 P.3d 516, 534 (N.M.2005) ("[T]he weighing of aggravating and mitigating circumstances is thus not a 'fact that increases the penalty for a crime beyond the prescribed statutory maximums."); *Commonwealth v. Roney*, 866 A.2d 351, 360 (Pa. 2005) (finding *Apprendi* does not apply to weighing evidence because it "is a function distinct from fact-finding"); *Ritchie v. State*, 809 N.E.2d 258, 266 (Ind. 2004) (concluding the relative weight of aggravating and mitigating circumstances is a balancing process, not a fact that must be proved beyond a reasonable doubt); *Brice v. State*, 815 A.2d 314, 322 (Del. 2003) (finding *Ring* does not apply to the weighing phase because weighing "does not increase the maximum punishment"), *overruled by Rauf v. State*, 145 A.3d 430, 433 (Del. 2016) (holding *Hurst* requires the jury to weigh aggravating and mitigating circumstances); *State v. Gales*, 658 N.W.2d 604, 629-30 (Neb. 2003) ("[W]e do not read either *Apprendi* or *Ring* to require that the determination of mitigating circumstances, the balancing function, or proportionality review be undertaken by a jury."); *Oken v. State*, 835 A.2d 1105, 1158 (Md. 2002) ("[T]he weighing process never was intended to be a component of a 'fact finding' process[.]"); *Ex parte Waldrop*, 859 So.2d 1181, 1190 (Ala. 2002) ("*Ring* and *Apprendi* do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.")

[14] Wood claims the special interrogatory showing the jury did not unanimously find the evidence in mitigation outweighed the evidence in aggravation does not show what the jury found and, instead, shows only what the jury did not find. Wood argues it is possible eleven jurors found the mitigating circumstances outweighed the aggravating circumstances. Wood's argument is irrelevant to his Sixth Amendment claim because it is premised on the faulty proposition the weighing step is a factual finding only the jury can make.

Neither Wood's point relied on nor his argument raised the additional meritless argument urged by the dissenting opinion. The dissenting opinion *sua sponte* asserts, as a matter of statutory interpretation, that § 565.030.4 requires the jury to make a factual finding that the mitigating evidence either does or does not outweigh the aggravating evidence. The dissenting opinion reasons that holding the weighing step is not a factual finding conflates the jury's role in the third and fourth steps. In other words, the dissenting opinion reasons that unless the weighing step is a factual finding, it is identical to the discretionary "mercy" determination in the fourth step.

Wood also cites *Whitfield* for the proposition that the § 565.030.4 deadlock procedure is equivalent to the Florida death penalty procedure held unconstitutional in *Hurst*. Wood relies on *Whitfield* to argue the § 565.030.4 deadlock procedure provides the jury's factual findings "simply disappear," and the circuit court independently finds the facts necessary to impose a death sentence. 107 S.W.3d at 271.

In *Whitfield*, the record did not demonstrate whether the jury made the required factual findings. *Id*. at 270. The resulting death sentence was not based on the jury's factual findings and, instead, was "entirely based" on the circuit court's findings. *Id*. at 261. In that circumstance, when there was no record the jury made the constitutionally required findings in the first place, *Whitfield* concluded the circuit court's "independent" findings resulted in a death sentence that violated the Sixth Amendment. *Id*. at 261.

Rather than limiting its holding to the determination there was no record the jury made any constitutionally required findings, *Whitfield* unnecessarily extrapolated a general rule that the § 565.030.4 deadlock procedure always eliminates the jury's factual findings and replaces them with the circuit court's factual findings. *See id*. at 271. Section 565.030.4, however, provides only that if the jury deadlocks on punishment, the court is to "follow the same procedure as set out in this section[.]"[15] Requiring the circuit court to

The plain language of § 565.030.4, however, establishes distinct inquiries for the jury at both steps. The weighing step balances the mitigating and aggravating circumstances, while the final step requires the jury to engage in a separate inquiry to determine "under all the circumstances" whether a death sentence is warranted. This Court's conclusion that neither of these determinations is a factual finding constitutionally entrusted to the jury does not mean they are the same.

[15] Following *Whitfield*, the jury instructions in capital cases were revised to require jurors to answer special interrogatories indicating whether they found a statutory aggravating factor to be present, and if so, what factor, and whether they found that mitigating evidence did not outweigh aggravating evidence. *Shockley*, 410 S.W.3d at 199 n.11. Section 565.030.4 provides:

31

"follow the same procedure" does not necessarily mean the jury's constitutionally required findings "simply disappear" or that the circuit court must displace the jury's constitutionally required factual findings with the court's independent findings. The Sixth Amendment

If the trier at the first stage of a trial where the death penalty was not waived finds the defendant guilty of murder in the first degree, a second stage of the trial shall proceed at which the only issue shall be the punishment to be assessed and declared. Evidence in aggravation and mitigation of punishment, including but not limited to evidence supporting any of the aggravating or mitigating circumstances listed in subsection 2 or 3 of section 565.032, may be presented subject to the rules of evidence at criminal trials. Such evidence may include, within the discretion of the court, evidence concerning the murder victim and the impact of the offense upon the family of the victim and others. Rebuttal and surrebuttal evidence may be presented. The state shall be the first to proceed. If the trier is a jury it shall be instructed on the law. The attorneys may then argue the issue of punishment to the jury, and the state shall have the right to open and close the argument. The trier shall assess and declare the punishment at life imprisonment without eligibility for probation, parole, or release except by act of the governor:

(1) If the trier finds by a preponderance of the evidence that the defendant is intellectually disabled; or

(2) If the trier does not find beyond a reasonable doubt at least one of the statutory aggravating circumstances set out in subsection 2 of section 565.032; or

(3) If the trier concludes that there is evidence in mitigation of punishment, including but not limited to evidence supporting the statutory mitigating circumstances listed in subsection 3 of section 565.032, which is sufficient to outweigh the evidence in aggravation of punishment found by the trier; or

(4) If the trier decides under all of the circumstances not to assess and declare the punishment at death. If the trier is a jury it shall be so instructed.

If the trier assesses and declares the punishment at death it shall, in its findings or verdict, set out in writing the aggravating circumstance or circumstances listed in subsection 2 of section 565.032 which it found beyond a reasonable doubt. If the trier is a jury it shall be instructed before the case is submitted that if it is unable to decide or agree upon the punishment the court shall assess and declare the punishment at life imprisonment without eligibility for probation, parole, or release except by act of the governor or death. The court shall follow the same procedure as set out in this section whenever it is required to determine punishment for murder in the first degree.

32

does not prohibit the circuit court during sentencing from finding facts previously found by the jury. *State v. Johnson*, 524 S.W.3d 505, 512 (Mo. banc 2017). As this Court observed in *Shockley*, § 565.030.4 "provides an extra layer of findings that must occur before the court may impose a death sentence." 410 S.W.3d at 198-99.[16]

Missouri's death penalty sentencing procedure is fundamentally different from the Florida statute the Supreme Court invalidated in *Hurst*. Unlike the Florida statute, § 565.030 does not limit the jury to providing an "advisory sentence" without making the constitutionally required factual findings rendering the defendant eligible for a death sentence. When, as in this case, the jury deadlocks on punishment, it has necessarily already made the constitutionally required factual finding of an aggravating circumstance. When the circuit court follows "the same procedure set out in this section" to resolve the jury's deadlock on punishment, the constitutional role of the jury as the finder of fact has already been fulfilled and the circuit court may only impose a death sentence when it confirms the finding of at least one aggravating circumstance and makes the non-factual, discretionary determinations that the aggravating circumstances outweigh mitigating circumstances and death is an appropriate sentence. This Court has repeatedly held neither of these determinations is a factual finding that must be performed by the jury. *Shockley,*

---

[16] Because the expansive interpretation of § 565.030.4 in *Whitfield* and advocated for by Wood is not compelled by the plain language of the statute, it violates the "accepted canon of statutory construction that if one interpretation of a statute results in the statute being constitutional while another interpretation would cause it to be unconstitutional, the constitutional interpretation is presumed to have been intended." *Blaske v. Smith & Entzeroth, Inc.*, 821 S.W.2d 822, 838-39 (Mo. banc 1991).

410 S.W.3d at 198-99; *Dorsey*, 318 S.W.3d at 653; *Anderson*, 306 S.W.3d at 540; *Zink*, 278 S.W.3d at 193. *Hurst* does not hold or imply otherwise. The § 565.030.4 penalty phase deadlock procedure does not violate the Sixth Amendment.

**B. Eighth Amendment**

Wood claims § 565.030.4 violates the Eighth Amendment and article I, § 21 of the Missouri Constitution because "evolving standards of decency" prohibit a judge from imposing a death sentence after the jury finds aggravating circumstances but deadlocks on punishment. The Eighth Amendment and article I, § 21 of the Missouri Constitution provide the same protection against cruel and unusual punishment. *State v. Nathan*, 522 S.W.3d 881, 882 n.2 (Mo. banc 2017); *State v. Lee*, 841 S.W.2d 648, 654-55 (Mo. banc 1992). Wood asserts § 565.030.4 is unconstitutional because Missouri's procedure is "an extreme outlier," with only Indiana employing a similar process.

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." "The Cruel and Unusual Punishments Clause prohibits the imposition of inherently barbaric punishments under all circumstances." *Graham v. Florida*, 560 U.S. 48, 59 (2010). "While the Eighth Amendment doesn't forbid capital punishment, it does speak to how States may carry out that punishment, prohibiting methods that are cruel and unusual." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1123 (2019) (internal quotation omitted).

In addition to categorically prohibiting cruel and unusual methods of punishment, the United States Supreme Court has construed the Eighth Amendment to prohibit punishments disproportionate to the offense because "[t]he concept of proportionality is

34

central to the Eighth Amendment." *Graham*, 560 U.S. at 59. In the death penalty context, proportionality requires "that capital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution." *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) (internal quotation omitted). Therefore, when the method of execution is not at issue, the analysis of Eighth Amendment challenges to a death sentence begins with "two subsets, one considering the nature of the offense, the other considering the characteristics of the offender." *Graham,* 560 U.S. at 60.

Wood's argument that the circuit court cannot resolve the jury's deadlock and impose a death sentence does not state an Eighth Amendment claim. First, there is no dispute the nature of the offense rendered Wood constitutionally eligible for a death sentence. "To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." *Tuilaepa*, 512 U.S. at 971-72. The jury found beyond a reasonable doubt Wood committed a first-degree murder and also found multiple aggravating circumstances.

Second, the fact the circuit court resolved the jury's penalty phase deadlock by determining the mitigating factors did not outweigh the aggravating factors and sentencing Wood to death does not relate to a "characteristic of the offender," like age or intellectual disability. *See Roper v. Simmons*, 543 U.S. 551, 578 (2005) (holding the Eighth Amendment prohibits the death penalty for juvenile offenders); *Atkins v. Virginia,* 536 U.S. 304, 321 (2002) (holding the Eighth Amendment prohibits the death penalty for offenders

35

who are "mentally retarded"). As Wood notes, sentencing procedures that fail to provide adequate standards to guide the sentencer's assessment of offender's characteristics may violate the Eighth Amendment. *See Hall v. Florida*, 572 U.S. 701, 715-24 (2014) (holding a statute requiring the defendant show an IQ score of 70 or below before being allowed to present additional evidence of intellectual disability evidence violated the Eighth Amendment). Wood's argument the Eighth Amendment prohibits the judge from resolving the jury's penalty phase deadlock does not show § 565.030 fails to provide adequate standards to guide the sentencer's assessment of the offender's characteristics and limit the death penalty to the most culpable offenders. Instead, Wood's argument distills to a recycled version of his meritless argument that the Sixth Amendment requires the jury to find the aggravating circumstances outweigh the mitigating circumstances and that death is an appropriate sentence. The § 565.030.4 deadlock procedure does not violate the Eighth Amendment.

Finally, Wood argues the circuit court erred by overruling his pretrial objection that § 532.030 and § 532.032 are unconstitutional because they fail to genuinely narrow the class of persons eligible for the death penalty to the most serious crimes and the most culpable offenders. Wood asserts the 17 aggravating circumstances set forth in § 532.032 are too numerous, unconstitutionally broad, and vest prosecutors with too much discretion. Wood cites no case supporting his arguments. This Court previously rejected similar arguments, and does so once again. *State v. Williams*, 97 S.W.3d 462, 473-74 (Mo. banc 2003) (statutory aggravators not unconstitutionally broad); *State v. Taylor*, 18 S.W.3d 366,

36

376 (Mo. banc 2000) ("Prosecutors are given broad discretion in seeking the death penalty").

## V. Proportionality

Section 565.035.3 imposes an independent duty on this Court to undertake a proportionality review to determine:

> (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found; (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

There is no indication Wood was sentenced to death as a result of passion, prejudice, or any other arbitrary factor. The evidence vividly demonstrated how Wood brutally and deliberately killed Hailey after abducting her, restraining her, and raping her. Wood's death sentence resulted from the brutality of his crime, not the passion, prejudice or arbitrariness of the sentencer.

The evidence also overwhelmingly supported the jury's unanimous finding beyond a reasonable doubt of multiple aggravating circumstances. The evidence showed Wood randomly selected Hailey, kidnapped her, raped and sodomized her, and then shot her at point blank range while she was bound and helpless.

Finally, the death sentence in this case not disproportionate to the penalty imposed in similar cases. This Court has affirmed a death sentence when the defendant murdered the victim after raping the victim. *Driskill*, 459 S.W.3d at 433; *Dorsey*, 318 S.W.3d at 659: *McLaughlin*, 265 S.W.3d at 277-78. This Court has affirmed death sentences resulting

37

from the murder of vulnerable, defenseless victims. *Anderson*, 306 S.W.3d at 544; *State v. Barton*, 998 S.W.2d 19, 29 (Mo. banc 1999); *State v. Clayton*, 995 S.W.2d 468, 484 (Mo. banc 1999). Hailey was vulnerable and defenseless. She was a 10-year-old girl randomly abducted by a grown man who then restrained her, raped her, and killed her before bleaching her lifeless body and stuffing it in a plastic tub. Finally, this Court has repeatedly affirmed death sentences in cases involving the heinous killing of a child. *See State v. Collings*, 450 S.W.3d 741, 768 (Mo. banc 2014) (concluding death sentence proportionate when defendant sexually abused and murdered a 9-year-old girl); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. banc 2006) (concluding death sentence proportionate when defendant admitted he kidnapped, attempted to rape, and then killed a 6-year-old).

This Court's independent research has identified no cases showing a death sentence for the random abduction, rape, and murder of a child is disproportionate. There is overwhelming evidence of Wood's guilt and the existence of multiple aggravating circumstances. The death sentence meets all statutory requirements.

## Conclusion

The judgment is affirmed.

_____
Zel M. Fischer, Judge

Wilson, Russell, Powell, and Breckenridge, JJ., concur;
Stith, J., dissents in separate opinion filed;
Draper, C.J., concurs in opinion of Stith, J.;
Breckenridge, J., concurs in section III of the opinion of Stith, J.

38



# SUPREME COURT OF MISSOURI
## en banc

STATE OF MISSOURI,           )
                              )
          Respondent,     )
                              )
v.                              )      No. SC96924
                              )
CRAIG M. WOOD,        )
                              )
          Appellant.      )

## DISSENTING OPINION

I disagree with the principal opinion's determination it was not prejudicial error to permit the prosecution to introduce testimony and some 29 photographs of weapons and gun accessories that were *not* used in the murder. I also disagree with its handling of the prosecution's intentional reference to evidence of the family's wishes for a death sentence, for such evidence is categorically inadmissible. The error was compounded by the fact the prosecutor had purposely kept out evidence that the victim's mother did not wish a death sentence to be imposed.

Finally, while I agree the jury made the three factual determinations required by section 565.030.4 and, therefore, the statute permitted the judge to determine whether to impose a death sentence, I disagree with the principal opinion that the third of the four questions the statute requires does not require the jury to make a factual determination. It

does. It requires the jury to weigh and balance the evidence supporting mitigation with the evidence in aggravation – a weighing and balancing each of our jurors is called on to make every day in our courts. The principal opinion's conclusion otherwise makes question three merely redundant of question four, which allows the jury to exercise mercy even if it has not found any of the three facts set out in questions one, two or three that would have required imposition of a life sentence.

The facts presented by the underlying crime are appalling and horrifying. This makes it even more important to apply settled legal principles. "It is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law." *Seilert v. McAnally, 122 S.W. 1064, 1068 (Mo. 1909)*. While I agree with much of the principal opinion, I am concerned that the terrible nature of the crime makes this the type of hard case about which *Seilert* cautioned.

## I. *IT WAS AN ABUSE OF DISCRETION TO ALLOW TESTIMONY AND 29 PHOTOS OF GUNS AND GUN-RELATED ITEMS AT MR. WOOD'S HOUSE THAT WERE UNRELATED TO THE CHARGED CRIME*

"The objection to the introduction of weapons or other demonstrative evidence, especially when not connected with the defendant or his crime, on the ground of unfair prejudice is based on sound psychological and philosophical principles." *State v. Wynne, 182 S.W.2d 294, 288 (Mo. 1944)*. But the principal opinion finds no error in the admission of what it terms "evidence of firearms of varying calibers and gauges found throughout Wood's home shortly after he killed Hailey." *Slip. Op. at 11*. In so ruling, it fails to acknowledge the staggering depth and breadth of unrelated gun evidence that the trial court

2

admitted. This is a horrific case. That does not justify the jettisoning of decades of case law.

"The courts of this state, with notable consistency, have recognized that weapons unconnected with either the accused or the offense for which he is standing trial lack any probative value and their admission into evidence is inherently prejudicial and constitutes reversible error." *State v. Perry, 689 S.W.2d 123, 125 (Mo. App. 1985)*. "[T]he sight of deadly weapons or of cruel injuries tends to overwhelm reason and to associate the accused with the atrocity without sufficient evidence." *Wynne*, *182 S.W.2d at 289, quoting 4 Wigmore, Evidence § 1157 (1940)* (reversing a second-degree murder conviction after demonstration to the jury with a weapon unconnected to the crime). "Lethal weapons completely unrelated to and unconnected with the criminal offense for which an accused is standing trial have a ring of prejudice seldom attached to other demonstrative evidence, and the appellate courts of this state have been quick to brand their admission into evidence … as prejudicial error." *State v. Charles, 572 S.W.2d 193, 198 (Mo. App. 1978)*.

The only reason advanced by the State that evidence of more than 20 unrelated guns and accessories is logically relevant is that the evidence goes to "prove he deliberately chose the smallest weapon from his collection to facilitate his efforts to cover up the murder" despite the fact other weapons were closer at hand. *Slip. Op. at 11*. But logical relevance is not sufficient – the circuit court also must determine legal relevance by weighing "the probative value of the evidence against its costs – unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *State v. Anderson*, *76 S.W.3d 275, 276 (Mo. banc 2002)*. The State could have made its point

3

simply by introducing evidence Mr. Wood owned numerous guns, he had to pass one or more to get to the gun he used, and it was the smallest. The judge might have permitted introduction of a picture of one or two of those guns. This would have balanced the prejudice resulting from introduction of this only minimally probative but highly prejudicial gun evidence.

Instead, the gun evidence became a centerpiece of the trial and went far beyond what was necessary to present the facts deemed relevant. During the guilt phase, the State presented evidence of the .22-caliber shell casing and rifle which appeared to be the weapon used to kill Hailey. Then, over Mr. Wood's objection, it also presented lengthy testimony from F.B.I. Special Agent Tucker about more than 20 other guns and gun-related accessories accompanying the guns. Agent Tucker testified Mr. Wood had a holstered Ruger .44 pistol on his dining room table, a .45-caliber pistol on a nearby bookshelf, a .38-caliber revolver on the bookshelf, a gun case with two semiautomatic handguns, a pump action shotgun just inside his bedroom, a .40 Springfield semiautomatic in his bedroom, a Smith and Wesson revolver in his storage room, a gun safe with 10 more guns in it, and a pump action shotgun to the right of the gun safe.

For each of these guns, the jury was shown a photograph of the weapon as Agent Tucker described the weapon. The State also asked Agent Tucker to describe finding weapon accessories, including: a speed reloader, the gun cases, and a bookshelf with a box of ammunition, and reloading supplies, which Agent Tucker described as a "reloading station." The State asked Agent Tucker to describe how a speed reloader worked, and why a person may purchase one, and showed the jury photographs of all of these items.

4

In total, the jury viewed **29** photographs of different weapons and accessories. The testimony by Agent Tucker accompanying the photographs stretches more than 20 pages in the transcript and likely took more than an hour. The jury also was shown a large diagram of Mr. Wood's home, and saw Agent Tucker mark an "X" where each of these weapons or accessories was located. At no time has it been argued any of these items besides the .22-caliber rifle was the murder weapon.

Case law has long established that even "logically relevant evidence is excluded if its costs outweigh its benefits." *Anderson, 76 S.W.3d at 276. State v. Holbert, 416 S.W.2d 129, 133 (Mo. 1967)*, rejected attempts to justify, in a trial for carrying a concealed weapon, the admission of two other pistols found on or near the defendant to show the "intent" of the defendant to carry a third pistol that was the basis of the charge. Given that intent to conceal is generally found when the person was found concealing a weapon, the Court said admission of an unrelated pistol found under a seat cushion "could have served no possible purpose except prejudice." *Id*.

Further, the principal opinion faults the prejudice analysis in this dissent for relying on cases in which the gun is unrelated to either the defendant or the crime. But that is incorrect. In *Holbert, 416 S.W.2d at 130,* this Court held the admission of a gun found in the defendant's shirt pocket and a gun found in the defendant's car was in error, despite the clear connection to the defendant and the scene of the crime, because those guns were unconnected to the **charge**. In so holding, this Court wrote, "the dangerous tendency and misleading probative force of this class of evidence require that its admission should be subjected by the courts to rigid scrutiny." *Id. at 132*. In *State v. Krebs, 106 S.W.2d 428,*

5

*429 (Mo. 1937),* this Court ruled evidence of two guns found on the defendant's person when he was arrested was admitted in error given that the State made no showing the guns were used in the crime for which he was arrested . *Accord Anderson, 76 S.W.3d at 276* (holding a glossy advertisement of semiautomatic weapons lacked legal relevance even though the pamphlet was found in the defendant's home and depicted the type of weapon used in crime, because it caused unfair prejudice, although not reversible when a one-time reference). This is because the question is legal relevance – when the prejudice created by a gun or gun related item outweighs the probative value, then it is legally irrelevant even if the evidence has some factual relationship to the case. Each case cited by this dissent is cited for and reaffirms this proposition.

The imbalance decried in these cases is present here. It would have been within the circuit court's discretion to permit the introduction of evidence Mr. Wood passed up a couple of guns located in or just outside the bedroom. But that some of the guns and gun accessories were relevant simply means the circuit court was not required to exclude all evidence of other guns. The circuit court then had a duty to weigh the probative value of each additional piece of gun evidence against the inherently prejudicial nature of gun evidence. From the record, it appears the circuit court skipped this step and simply admitted evidence *en masse* after finding slight relevance without considering evidence as to a particular gun or accessory to determine whether this additional evidence actually was legally relevant, and how to limit its prejudicial impact. This was error. *Holbert, 416 S.W.2d at 130* (holding that, when weapons unconnected to the crime were admitted, it was "perfectly obvious that their use throughout the trial was prejudicial to the defendant").

6

This holds true for the evidence of gun accessories such as reloaders as well. There of course could be no suggestion that Mr. Wood could have killed Hailey with a gun accessory, and it is undisputed he did not use a gun accessory to commit the murder. Yet the prosecution did not merely mention Mr. Wood had these accessories; rather, it spent considerable time describing them and their use. For example, although there was no contention a reloader was used in the crime, the prosecution was permitted to introduce photographs of the reloader, a diagram marking where it was found, and extensive witness testimony, which included an explanation of how a speed reloader works, and possible reasons a person might purchase one.

None of this highly prejudicial evidence of reloaders and other accessories is relevant to whether Mr. Wood committed the murder, and the State offers no explanation as to why this extended evidence about a speed reloader is needed to show deliberation through Mr. Wood choosing one gun over another. Nor has it justified evidence of the "reloading station" with boxes of ammunition, reloading supplies, and reloading equipment. A much more likely explanation for the submission of this extensive evidence is to establish a propensity for violence.

Nor is this error harmless. The extended testimony, combined with a diagram and dozens of photographs, highlighted its prejudicial nature. "Admission of the shotgun into evidence by virtue of its inherent prejudicial nature and lack of relevancy, coupled with the state's advert reference to it before the jury to obtain defendant's conviction, dispel any credence to the state's argument that any error associated therewith was harmless …." *Perry, 689 S.W.2d at 126*. This is particularly true here, where despite the horrific facts

7

of the case, the jury was deadlocked as to punishment. But for this extensive prejudicial evidence, the jury may have assessed the punishment at life imprisonment without parole. For this reason, I would find the introduction of so many guns and gun accessories here is prejudicial error and reverse.

**II.    THE CIRCUIT COURT PLAINLY ERRED IN OVERRULING MR. WOOD'S OBJECTION TO THE PROSECUTOR'S ARGUMENT IN THE PENALTY PHASE THAT THE JURY SPOKE FOR HAILEY AND HER FAMILY BECAUSE THE LAW SPECIFICALLY PROHIBITS FAMILY MEMBERS' COMMENTS ABOUT PUNISHMENT AND THE PROSECUTOR EXCLUDED EVIDENCE HAILEY'S MOTHER DID NOT WANT A DEATH SENTENCE**

The principal opinion declines to find that the prosecutor's comment in closing argument that the jurors would "speak for [Hailey's] family" by sentencing Wood to death was plain error causing manifest injustice. *Slip. Op. at 17-19*. Whether this comment would require reversal in another case, it manifestly should do so when, as here, it was the prosecutor who successfully kept out evidence that Hailey's mother did not in fact want him to receive the death penalty. We have not only a comment by the prosecutor in violation of the rules prohibiting telling the jury the family's wishes as to punishment, therefore, but we also have the prosecutor deliberately misrepresenting those wishes to the jury. As discussed below, courts have often found prejudice when the prosecution requires evidence to be excluded and then takes advantage of that exclusion to misrepresent the evidence to the jury.

Pretrial, Mr. Wood sought to elicit testimony in the penalty phase of Hailey's family's wish that he receive a sentence of life without parole. At the hearing, Hailey's mother testified that, if called in the penalty phase and asked what sentence she wanted

8

Mr. Wood to receive, she would say life without parole. Upon further questioning from the court, she testified she wanted to avoid a trial and encourage Mr. Wood to plead guilty. When asked, if the State insisted on a trial, "what would you like to see happen to Mr. Wood as a result of him having killed your daughter?" the victim's mother responded that her answer would still be life without parole, even if the trial happened.

The circuit court correctly excluded the mother's evidence, following the United States Supreme Court's opinion in *Bosse v. Oklahoma, 137 S. Ct. 1, 2 (2016)*, and this Court's opinion in *State v. Barnett, 103 S.W.3d 765, 772 (Mo. banc 2003),* expressly holding "[o]pinions of family members as to the appropriate punishment are irrelevant" and "[t]he jury should not be put in the position of carrying out the victim's wishes, whether they are for or against the death penalty." But, during closing argument, the prosecutor then implied he knew the family wanted a death sentence when in arguing for the death penalty he told the jury:

> MR. PATTERSON: With your verdict, sentencing [Mr. Wood] to the ultimate punishment, you speak for Hailey --
> MR. BERRIGAN: We'd object, Judge.
> MR. PATTERSON: **You speak for her family** --

At this point, defense counsel objected again, and argued the prosecutor's argument "improperly attributes the decision regarding life or death to Hailey Owens and her family." The circuit court overruled the objection. The prosecutor then returned to the argument, stating Mr. Wood "not only brutalized Hailey, but he damaged her family, her brother, her school, her entire community, and changed our community, and your verdict will send a message to this defendant."

9

The principal opinion erroneously concludes all of the statements from the prosecutor in that exchange can properly fall under "send a message" testimony. *Slip. Op. at 18-19*. This Court has indeed held it is permissible for the State to make statements "amount[ing] to a call for action, requesting jurors to send a message of intolerance to the community." *State v. Smith, 944 S.W.2d 901, 919 (Mo. banc 1997)*; *accord State v. McFadden, 391 S.W.3d 408, 425 (Mo. banc 2013)* (explaining the State may argue "the need for strong law enforcement, the prevalence of crime in the community, and that conviction of the defendant is part of the jury's duty to uphold the law and prevent crime" [and] "the protection of the public rests with them" (internal quotations omitted)).

But while this precedent supports a finding no error resulted from the prosecutor's later "send a message" argument, the principal opinion fails to explain how this precedent would permit the prosecutor's preceding, clearly improper argument that, in deciding life or death, the jury would "speak for Hailey" and "for her family." This is more than a statement calling on the jurors to think about their role in protecting the public or their duty to the community. This is the State asking the jury to act **on behalf of the family**.

Contrary to the principal opinion's suggestion that only direct testimony of a family member is prohibited, such comments purporting to ask the jury to represent the family's wishes fall within the scope of comment the United States Supreme Court has held is prejudicial and not to be permitted in *Booth v. Maryland, 482 U.S. 496, 508 (1987). Booth* did not involve direct family testimony. Rather, it considered whether it was error for the prosecutor to read aloud to the jury from a victim impact statement, prepared by the state division of parole and probation, that contained reports of the family members' opinions

10

about sentencing, including a statement from the victim's daughter that "[s]he doesn't feel that the people who did this could ever be rehabilitated." *Id*. The Supreme Court held "the formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." *Id.* Admission of the evidence required reversal.

While the Supreme Court has since held that victim impact testimony is permitted, *see Payne v. Tennessee, 501 U.S. 808, 827 (1991)*, it has reaffirmed the inadmissibility of evidence of the wishes of the victim's family as to punishment. *Bosse, 137 S. Ct. at 3*, reversed the Oklahoma Court of Criminal Appeals' conclusion that family views about punishment were now admissible, specifically stating that, until it specifically overruled that part of *Booth,* which it said it had not done, the Eighth Amendment creates a "prohibition on characterizations and opinions from a victim's family members about the crime, the defendant, and the appropriate sentence."

The principal opinion's attempt to distinguish *Booth* and *Bosse* because the family itself did not testify is no distinction at all. The family did not testify in *Booth* either, and the plain language of *Bosse* shows the Supreme Court's disapproval was not as to how the family's wishes came into evidence, but rather was the fact those wishes came into evidence at all. *Id.* Indeed, as this Court stated in *Barnett*, the jury should not be told of the family's wishes, for "[t]he jury should not be put in the position of carrying out the victims' wishes, whether they are for or against the death penalty." *103 S.W.3d at 772. accord State v. Taylor, 944 S.W.2d 925, 938 (Mo. banc 1997)* (explaining a victim's family members should never give an opinion about the appropriateness of a particular sentence).

11

Here, the jurors were told that, in deciding death, they would "speak for" the family. This can only be understood as a comment about the family members' wishes and opinions. This directly violates governing Supreme Court law.

The principal opinion also contends that, because it was an isolated statement and connected to other, permissible statements, Mr. Wood cannot show manifest injustice. But the Supreme Court has made it clear telling the jury about the victim's wishes is a serious violation – even when the information is accurate. Missouri law agrees. It is well-settled that a prosecutor commits error by "comment[ing] on or refer[ring] to evidence or testimony that the court has excluded." *State v. Williams, 119 S.W.3d 674, 680 (Mo. App. 2003)* (alterations in original).

Equally telling, the information was not accurate. The prosecutor went beyond simply commenting inappropriately about the family's opinions. He deliberately distorted the family's opinions after taking action to ensure the family could not testify about their opinions.

Missouri courts have repeatedly held it is manifest injustice requiring reversal for a prosecutor to intentionally misrepresent evidence to the jury after seeking the exclusion of that same evidence. *Id. at 681*; *State v. Weiss, 24 S.W.3d 198, 204 (Mo. App. 2000)*. Here, the prosecutor was self-evidently well aware that commenting about what the family desires for punishment is not allowed, as he demonstrated in his successful argument to exclude the evidence. To then turn around and deliberately argue something he not only knows is not permissible, but that he also knows to be exactly the opposite of what the mother would actually have said, is inexcusable behavior and is manifestly unjust. *State*

12

*v. Hammonds, 651 S.W.2d 537, 539 (Mo. App. 1983)*. It requires reversal of the penalty phase verdict.

### III. THE JURY DETERMINATION WHETHER THERE IS EVIDENCE IN MITIGATION SUFFICIENT TO OUTWEIGH EVIDENCE IN AGGRAVATION IS A FACTUAL FINDING

In section 565.030.4,[1] the legislature set out four requirements for a jury assessing and declaring punishment in a death case, as follows:

> The trier shall assess and declare the punishment at life imprisonment without eligibility for probation, parole, or release except by act of the governor:
>
> (1) If the trier finds by a preponderance of the evidence that the defendant is intellectually disabled; or
>
> (2) If the trier does not find beyond a reasonable doubt at least one of the statutory aggravating circumstances set out in subsection 2 of section 565.032; or
>
> (3) If the trier concludes that there is evidence in mitigation of punishment, including but not limited to evidence supporting the statutory mitigating circumstances listed in subsection 3 of section 565.032, which is sufficient to outweigh the evidence in aggravation of punishment found by the trier; or
>
> (4) If the trier decides under all of the circumstances not to assess and declare the punishment at death. If the trier is a jury it shall be so instructed.

Rather than setting out what the jury must find to impose a death sentence, the statute directs the jury it must first make a factual determination whether a defendant is intellectually disabled. If so, the jury is required to impose a life sentence. Second, the jury is told it must determine whether at least one statutory aggravator was proved. If not,

---

[1] All statutory references are to RSMo 2000.

13

it must impose a life sentence. Third, the jury is told it must make a determination whether "there is evidence in mitigation of punishment" which outweighs "the evidence in aggravation of punishment." *Id.* If so, again, it must impose a life sentence. Only when the jury has made these findings does it "decide[] under all the circumstances" whether to exercise discretion to impose life in prison as a matter of mercy.

I do not disagree with the majority opinion that, in this case, the record shows the jury made the factual findings required by section 565.030.4(1), (2), and (3) and deadlocked only on the question in section 565.030.4(4) whether they should exercise their discretion to impose a sentence of life. This distinguishes this case from *State v. Whitfield*, *107 S.W.3d 253, 261 (Mo. banc 2003),* in which, because no jury interrogatories were used, this Court was unable to determine whether the jury made the necessary findings under the balancing question. The record revealed only that the jurors were split on punishment, but not at what point the jurors became split. *Id*. The death sentence imposed was "entirely based on the judge's findings that all four steps favored imposition of the death penalty." *Id. at 262-63*. Because of this, *Whitfield* specifically required affirmative, unanimous, jury findings on the questions then required by Missouri law, including that there was a statutory aggravator and that mitigation did not outweigh aggravation. *Id. at 264*.

The kind of unanimous jury findings required by *Whitfield* were returned by the jury here. The jury did not find Mr. Wood intellectually disabled, did find a statutory aggravator, and did not find that the evidence in mitigation outweighed that in aggravation. Had the jury found otherwise on any of these questions, section 565.030.4 would have capped Mr. Wood's sentence at life. On (4), however, the jury deadlocked as to whether

14

to grant mercy despite its failure to find grounds for limiting the available sanction to life in (1), (2) and (3). The trial judge was tasked under the statute, therefore, to make that ultimate decision. I agree this last question asks the jurors and then the judge to look into their hearts and determine whether to exercise mercy.

The principal opinion errs, however, in conflating this last question of mercy with the third question, in which the jury is asked to balance mitigating and aggravating evidence and decide whether the former outweighs the latter. The principal opinion appears to believe, because the jury already determined there is a statutory aggravator, death is on the table and the third question, therefore, is just an extra opportunity for mercy by the jury. But question order cannot turn a requirement for imposition of a death sentence into a superfluity.

Imagine, for instance, that the instruction reversed the order of the questions (the statute itself prescribes no particular order), and first asked the jury to decide whether there is evidence in mitigation outweighing the evidence in aggravation, and only later asked whether the jury had found a statutory aggravator. Would that make the statutory aggravator question simply one that goes to mercy, one not required for imposition of the death penalty? Of course not. The finding of such an aggravator is required both by the United States Supreme Court under the United States Constitution, and by section 565.030.4(2). It is a factual question that must be answered to impose death.

15

The same is true when, as here, the instructions have been written to ask the statutory aggravator and intellectual disability questions first, and then the balancing question.[2] Word order does not define importance, for all three questions must be answered in order for either judge or jury to impose a sentence of death. It is only the fourth requirement, at which the jury has made its factual determinations and is tasked with deciding whether, nonetheless, to impose a life sentence, that the judge is permitted to decide on the sentence if the jury deadlocks.

The principal opinion also seems to suggest the third question is not one of fact because it requires the jury to balance the evidence and this somehow is akin to being asked whether to grant mercy. If this were correct, it would make the fourth requirement redundant and superfluous. It is not correct, however. The principal opinion's approach ignores that jurors are asked to balance the evidence in making factual determinations every day.

Indeed, the first two questions in section 565.030.4 also require the jury to balance the evidence – to weigh the evidence of whether defendant is intellectually disabled and whether the evidence shows a statutory aggravator. The only difference in (3) is that the

_____

[2] The principal opinion notes that, under current Supreme Court jurisprudence, finding a statutory aggravator is present is all that is required by the Sixth Amendment. *See Kansas v. Marsh, 548 U.S. 163, 175 (2006), quoting, Franklin v. Lynaugh, 487 U.S. 164, 179 (1988)* (holding a statutory scheme must allow for the narrowing of death-eligible offenses and for the fact finder to consider mitigating evidence, but "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding" is not required (internal quotations omitted)). My argument is not with the principal opinion's Eighth Amendment analysis but with its statutory interpretation. While the constitution may not require that the jury balance this evidence, section 565.030.4 does so require.

16

statute explicitly tells the jury what evidence it is to consider – the mitigating and aggravating evidence. To do so, the jury must make the same kinds of credibility determinations and weighing and drawing of inferences from the evidence as it does in answering the first two questions.

Such balancing and weighing of evidence to reach a verdict has historically been the province of the jury. "The credibility and **weight** of testimony are for the fact-finder to determine." *State v. Crawford, 68 S.W.3d 406, 408 (Mo. banc 2002)* (emphasis added). It is the jury's task to "determine the credibility of the witnesses, resolve conflicts in testimony, or **weigh the evidence**." *Fowler v. Daniel, 622 S.W.2d 232, 236 (Mo. App. 1981)* (emphasis added). On appellate review, "this Court will not **weigh** the evidence anew since the fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *State v. Freeman, 269 S.W.3d 422, 425 (Mo. banc 2008)* (internal quotations omitted) (emphasis added). In fact, this Court's standard of review often requires a determination whether the evidence on one side so outweighed that on the other that the jury verdict is "against the weight of the evidence." This necessarily recognizes the jury must weigh the evidence to reach its verdict, as it "denotes an appellate test of how much persuasive value evidence has, not just whether sufficient evidence exists that tends to prove a necessary fact." *Ivie v. Smith, 439 S.W.3d 189, 206 (Mo. banc 2014)* (internal quotations omitted); *White v. Dir. of Revenue, 321 S.W.3d 298, 309 (Mo. banc 2010)*.

Because the third question requires a factual finding by the jury, as *Whitfield* held, it cannot be found by the judge if the jury had deadlocked on the third, not the fourth,

17

question. It is the jurors who must balance the evidence and make the factual determination whether evidence in mitigation outweighs that in aggravation. I believe the interrogatories make it clear the jury here did make such a factual determination that mitigators did not outweigh aggravators. To the extent the principal opinion states such a factual determination is not required, it is incorrect and the cases on which it relies should be overruled on that point.[3] Failure of the jury to make any of the three findings required under subdivisions (1) through (3) of section 565.030.4 precludes imposition of a death sentence because a jury must find every fact necessary for imposition of a death sentence.

## IV.   CONCLUSION

For the reasons stated above, I dissent.

_____
**LAURA DENVIR STITH, JUDGE**

---

[3] The principal opinion cites to statements in *State v. Dorsey, 318 S.W.3d 648, 653 (Mo. banc 2010), State v. Anderson, 306 S.W.3d 529, 540 (Mo. banc 2010),* and *Zink v. State, 278 S.W.3d 170 (Mo. banc 2009)*, to support its position.